No. 57,437

TERRY HOPKINS, CHRIS HOPKINS, RICHIE HOPKINS, By and through his Guardian and Next of Friend, TERRY HOPKINS, and JASON HOPKINS, by and through his Guardian and Next of Friend, TERRY HOPKINS, *Appellants*, v. STATE OF KANSAS, KANSAS HIGHWAY PATROL, SALINA POLICE DEPARTMENT, CITY OF SALINA, JOHN WOODY, SALINE COUNTY SHERIFF'S DEPARTMENT and SALINE COUNTY, *Appellees*.

(702 P.2d 311)

Opinion filed July 2, 1985.

*Steven M. Dickson,* of Topeka, argued the cause and *Judy A. Pope,* of McCullough, Wareheim & LaBunker, of Topeka, was on the brief for appellants.

*George F. Farrell, Jr.,* of Benfer and Farrell, of Topeka, argued the cause and *J. Stan Sexton,* of Salina, was with him on the brief for appellees Saline County and the Saline County Sheriff's Department.

*James P. Mize,* of Salina, argued the cause for the appellee City of Salina.

*Wm. Scott Hesse,* assistant attorney general, argued the cause, and *Robert T. Stephan,* attorney general, and *Dan Biles,* assistant attorney general, were on the brief for appellee Kansas Highway Patrol.

The opinion of the court was delivered by

LOCKETT, J.: Plaintiffs filed a civil action alleging negligence on the part of the defendant law enforcement officers and various governmental entities for damages resulting from the apprehension of an intruder who had occupied the plaintiffs' mobile home. After dismissing several defendants from the lawsuit, the district court granted the remaining defendants' motion for summary judgment.

On July 29, 1981, an individual named Randall O'Brien illegally entered a mobile home owned by the plaintiffs. At the time of his entry, there was no one present in the mobile home. During the late afternoon, plaintiff Terry Hopkins arrived at the home which is located in a rural area northwest of Salina. He did not enter the mobile home but went to a nearby corral to talk with a friend.

Approximately an hour later, Hopkins' two sons, Richie and Jason, arrived home, entered the mobile home, found the kitchen in disarray and the intruder sitting on a bed. They exited

the home and told their father of the intruder's presence. He called the Saline County Sheriff's Office.

Shortly thereafter, Deputy Sheriffs Debbie Redmond and Patricia Endsley arrived at the scene. One went to the front door and one to the back door. Deputy Redmond entered the mobile home and saw O'Brien sitting on a couch eating a sandwich with a rifle standing between his legs. After O'Brien asked for a cigarette and then refused to leave, Redmond exited and summoned additional law enforcement personnel.

Law enforcement officers from the Saline County Sheriff's Department, Salina Police Department (SPD) and Kansas Highway Patrol arrived soon after. All non-law enforcement personnel except Terry Hopkins were eventually removed from the premises. Terry Hopkins informed some officers that he had a 30/30 high-powered rifle, a .22-caliber rifle and a 12 gauge shotgun in the home. He also advised the officers that he believed there were two rounds of ammunition for the 30/30 rifle and one shell for the 12 gauge shotgun in the house. That information was not circulated to all officers. It was unknown whether the intruder had any additional weapons.

For several hours police officers attempted to persuade O'Brien to leave the home. O'Brien was informed if he put down his gun and came out of the home, he would not be in serious trouble. The intruder responded several times that he had "killed a policeman and a woman in Texas" and feared that the officers would kill him. As time passed, the officers became impatient and ordered the intruder to exit the mobile home and surrender. When the intruder failed to surrender, the officers decided to use tear gas in an effort to force the intruder from the home. Sometime during the period officers were shooting tear gas into the home, the intruder fired two shots at the officers. After numerous discharges of tear gas failed to cause O'Brien to come out, officers began rapid firing into the home in an attempt to flush the intruder out. After a hail of bullets, a wounded O'Brien emerged from the mobile home and was captured by the law enforcement officers.

After O'Brien's apprehension it came to light that O'Brien had earlier that day been detained for investigation by the SPD. Determining that O'Brien had neither committed a violation nor that any warrant for his arrest had been issued by other law

enforcement authorities, he was transported to the city limits and released near the Hopkins' mobile home by officers of the SPD, following a somewhat archaic police procedure called "floating."

As a result of the exchange of gunfire between the intruder and law enforcement personnel and the officers' attempt to flush the intruder by firing into the home, the plaintiffs' mobile home was extensively damaged. None of the plaintiffs, however, suffered any direct bodily injury as a result of the incident. Mr. Hopkins was the only plaintiff who saw the officers firing into the home and witnessed the damage to the home as it occurred.

On July 28, 1983, the plaintiffs filed this action in Saline County District Court. The City of Salina (City), the SPD, and the Kansas Highway Patrol (KHP) were all dismissed from the case after the district court ruled that the plaintiffs had no jurisdiction over any of those defendants because of improper service. The Saline County Sheriff's Department (SCSD) and Saline County (County) filed a motion for summary judgment on July 20, 1984. On September 14, 1984, the district court sustained defendants' motion for summary judgment. Plaintiffs appeal.

Plaintiffs claim the City waived all defenses of lack of personal jurisdiction based upon insufficiency of process or insufficiency of service of process. The petition in this action was filed on July 28, 1983. Service of process was made on the City on July 29 by serving Larry Bengston, the city attorney. On August 26, 1983, the City, the SPD and John Woody, chief of the SPD, filed an answer in which they alleged that "the Court has no jurisdiction of the person of the City in this action." On April 27, 1984, the district court entered an order to dismiss the action against the City and the SPD for lack of jurisdiction.

K.S.A. 60-304(d)(3) requires that service upon a city shall be made by delivering a copy of the summons and of the petition to the clerk or the mayor. The Hopkins contend that while service was improperly made upon the city attorney, the defendants waived that defense, because in the City's answer it alleged lack of personal jurisdiction only, and not specifically insufficiency of service of process.

K.S.A. 60-212(b) requires that every defense, in law or fact, to a claim for relief in any pleading be asserted in the responsive pleading if required. The defenses include lack of jurisdiction

over the person, insufficiency of process, and insufficiency of service of process. The defenses are waived if not raised by motion or included in a responsive pleading or an amendment of a responsive pleading. K.S.A. 60-212(h).

The issue of improper service upon a city was considered in *Dunn v. City of Emporia,* 7 Kan. App. 2d 445, 643 P.2d 1137, *rev. denied* 231 Kan. 799 (1982). There, as here, service was made on the city attorney rather than the clerk or mayor. The court in *Dunn* found that the service was void rather than voidable and that the action was never "commenced" at all. *Dunn* is applicable to the facts in this case, and the court was correct in finding that the service on the City was void. The question then is whether the city waived the defense of insufficiency of process.

Service of process is for the purpose of notifying a defendant of the claim or charge against him so that he may properly prepare himself to answer it. It is this notice which gives the court jurisdiction to proceed. To say that process confers jurisdiction means that it empowers the court to exercise authority derived from law. 62 Am. Jur. 2d, Process § 2. See *Jones v. Garrett,* 192 Kan. 109, 386 P.2d 194 (1963).

Here, service of process was void, not just voidable. Since service was void, the court never acquired any type of jurisdiction over the City, the SPD or John Woody. The defendants were correct in raising lack of personal jurisdiction as a defense. It may be possible to have personal jurisdiction over a defendant even though process was improperly served, but here the service was void and the court did not acquire personal jurisdiction. The trial court was correct in ruling that the parties did not confer jurisdiction upon the court by waiver of a defense.

In their original petition, plaintiffs failed to name the State of Kansas (State) as a party defendant. Thereafter, plaintiffs filed a motion to amend and add the State. At approximately the same time, the defendant KHP filed a motion to dismiss, arguing that it did not have the capacity to sue or be sued. At the hearing on the KHP's motion, the court orally granted the plaintiff's motion to amend to add the State as a party defendant. The court later granted the KHP's motion to dismiss. KHP argues that a governmental agency has the capacity to sue and be sued only when a statute grants that authority, and KHP has never been given that capacity. The plaintiffs contend that the KHP, as an executive

agency of the State under the Kansas Tort Claims Act, is a proper defendant in the action and ask that it be reinstated.

K.S.A. 75-6103 subjects each governmental entity to liability for damages caused by the negligent or wrongful act or omission of any of its employees while acting within the scope of their employment under circumstances where the governmental entity, if a private person, would be liable under the laws of this state. K.S.A. 75-6102(c) defines a governmental entity as a state or municipality. K.S.A. 75-6102(a) defines state to include the State of Kansas *and* (not *or*) any department or branch of state government, or any agency, authority, institution or other instrumentality thereof. The trial judge determined the court lacked jurisdiction over the KHP and stated:

"The legislature may create a separate governmental entity with the capacity to sue and be sued but such authority must be expressly created. *Murphy v. City of Topeka,* 6 Kan. App. 2d, 488 at 491. K.S.A. 74-2105 *et seq.,* contains no such authority. The Kansas Tort Claims Act deals only with the subject matter of liability of the State and its entities as they might exist. It does not undertake to change the governmental organization or structure nor the nature or capacity of any of the State's instrumentalities."

There is a line of Kansas cases which holds that subordinate government agencies do not have the capacity to sue or be sued in the absence of statute. One of the first of these was *Dellinger v. Harper County Social Welfare Board,* 155 Kan. 207, 124 P.2d 513 (1942). There a physician attempted to sue the county welfare board to recover fees for services he provided to indigents. It was determined that county welfare boards created under the provisions of the social welfare act do not, under the general powers given to them by statute, have legal capacity to conduct or defend litigation. See *Erwin v. Leonard,* 166 Kan. 630, 203 P.2d 207 (1949); *In re Estate of Butler,* 159 Kan. 144, 152 P.2d 815 (1944); *Murphy v. City of Topeka,* 6 Kan. App. 2d 488, 630 P.2d 186 (1981).

K.S.A. 74-2105 *et seq.* establishes the functions, duties and powers of the Kansas Highway Patrol. None of the statutes grant the Patrol the capacity to sue or be sued.

In contrast, one can look at the statutes which created the Kansas Turnpike Authority, now K.S.A. 1984 Supp. 68-2004, and the Kansas Highway Commission, G.S. 1929, 68-419. As pointed out in *Anderson Cattle Co. v. Kansas Turnpike Authority,* 180 Kan. 749, 755, 308 P.2d 172 (1957), both agencies were statu-

torily given the capacity to sue and be sued. The district court was correct in determining that the KHP had not been granted the power to sue or be sued.

The plaintiffs contend that summary judgment was not proper in this case because such facts as how many tear gas grenades were used, which law enforcement agencies were involved in the shooting, who was in command and whether the plaintiffs were psychologically injured were not determined before summary judgment was granted. Defendants claim such facts were not material facts and that summary judgment was, therefore, proper.

Summary judgment is proper if no genuine issue of fact remains, giving the benefit of all inferences which may be drawn from the admitted facts to the party against whom judgment is sought. A trial court, in ruling on motions for summary judgment, should search the record to determine whether issues of material fact do exist. When a motion for summary judgment is filed, a mere surmise or belief by the trial court, no matter how reasonably entertained, that a party cannot prevail upon a trial will not justify refusing that party his day in court. When summary judgment is challenged on appeal, an appellate court must read the record in the light most favorable to the party who defended against the motion for summary judgment. *McAlister v. Atlantic Richfield Co.*, 233 Kan. 252, Syl. ¶¶ 1, 2, 3, 4, 662 P.2d 1203 (1983); *Ebert v. Mussett*, 214 Kan. 62, 65, 519 P.2d 687 (1974); *Lawrence v. Deemy*, 204 Kan. 299, 301-02, 461 P.2d 770 (1969).

The trial court ruled that the County and the SCSD were entitled to summary judgment based on the general rules of common-law immunity and on immunity granted under the Kansas Tort Claims Act.

The trial court found that the defendants were immune from liability under K.S.A. 75-6104(c), (d) and/or (m). The plaintiffs contend, however, that those sections of the Tort Claims Act are inapplicable in the instant case.

K.S.A. 75-6104(c) states:

"75-6104. Same; exceptions from liability. A governmental entity or an employee acting within the scope of the employee's employment shall not be liable for damages resulting from:

. . . .

(c) enforcement of or failure to enforce a law, whether valid or invalid, including, but not limited to, any statute, regulation, ordinance or resolution."

The plaintiffs claim defendants are not immune under this section because the defendants committed an additional tortious act, that of acting outrageously and recklessly in demolishing plaintiffs' home. This act, the plaintiffs contend, was outside the authority of the defendants as authorized by law. The Sheriff's Department argues that its acts were not outside the statutory authority granted to it, but were a proper exercise of statutory authority to keep and preserve the peace, and to quiet and suppress all affrays and riots. K.S.A. 19-813.

The general rule is that a state (sovereign) cannot be sued without its consent. No suit, whether at law or in equity, can be maintained against the state unless the state has given its consent or waived its immunity. The purpose of the immunity is to protect the state from interference with the performance of its governmental functions.

When the concept of governmental immunity was first conceived in this state, the state and its agencies devoted their time and energy to the function of governing. As the needs and wants of the citizens increased, our state government began to engage in endeavors that were not governmental but proprietary functions. The judiciary began the erosion of governmental immunity and denied tort immunity to municipal governments performing "proprietary" or "permissive" functions.

In *Carroll v. Kittle,* 203 Kan. 841, 457 P.2d 21 (1969), the court recognized that the doctrine of governmental immunity had judicial origin. The legislature, having adopted no general rules, had left the matter to the courts to determine the policy. Courts had provided general rules for determining whether the governmental body had embarked on an enterprise which was commercial in character or which was usually carried on by private individuals or private companies, thereby losing its immunity. Because the legislature was in a better position than the court to restrict the application of governmental immunity, the court abolished the judicially-created doctrine of governmental immunity.

The legislature responded to the *Carroll* decision by enacting K.S.A. 46-901 *et seq.* (Weeks). These statutes declared the state, its departments, agencies, institutions, etc., to be immune from liability and suit on an implied contract, or for negligence or any other tort, unless otherwise specifically provided by law. K.S.A.

46-902 (Weeks) specified that the liabilities of local units of government were to be unaffected by this legislative declaration of governmental immunity.

In June, 1975, the Kansas Supreme Court in *Brown v. Wichita State University,* 217 Kan. 279, 540 P.2d 66 (1975), *modified on rehearing* 219 Kan. 2, 547 P.2d 1015 (1976), held 46-901 and 902 to be unconstitutional on several grounds. The Court noted that these statutes block access to the courts for persons "seeking redress for injuries occasioned by the negligent acts of a governmental entity." 217 Kan. at 298. The court, however, on rehearing *Brown,* determined that K.S.A. 46-901 *et seq.* (Weeks) was constitutionally valid.

The legislature then enacted K.S.A. 75-6101 *et seq.* which became effective July 1, 1979. For negligent or tortious conduct, liability became the rule, immunity the exception. The burden was placed upon the governmental entity or employee to establish entitlement to any of the exceptions set forth in K.S.A. 75-6104. Unfortunately, the legislature did no better than the courts to clarify which specific functions of government should be exempt from liability.

In *Brown,* we recognized that the governmental-proprietary distinction still has vitality. Implicit in this distinction is that it is not a tort to govern. The legislature, when enacting the Tort Claims Act, also recognized the distinction between governmental and proprietary functions and used our prior case law to indicate policy directions.

We are certain that for a governmental entity to be liable for damages there must be: (1) a negligent or wrongful act or omission by one of its employees, and (2) the employee (a) must be acting within the scope of his employment, and (b) under circumstances where the governmental entity, if a private person, would be liable under the laws of this state. K.S.A. 75-6103. Since a private person cannot govern, the governmental entity is not liable for negligent or wrongful acts or omissions committed during the performance of a governmental function by an employee. (For exceptions see *Jackson v. City of Kansas City,* 235 Kan. 278, 680 P.2d 877 1984). Most of the exceptions from liability contained in 75-6104 are legislative codification of governmental functions for which the court had previously granted governmental immunity, such as: legislative immunity; judicial

immunity; enforcement or failure to enforce a law; assessment or collection of a tax or special assessment; and failure to provide, or method of providing, fire and police protection. See 75-6104(a), (b), (c), (e) and (m).

In addition, the act provides immunity from liability for "any claim based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a governmental entity or employee, whether or not the discretion be abused." K.S.A. 75-6104(d). The legislature failed to define what it meant by the term "discretionary function" and shifted that obligation to the courts.

"Discretion" has been defined as the power and the privilege to act unhampered by legal rule. It is also defined as the capacity to distinguish between what is right and wrong, lawful and unlawful, wise or foolish, sufficiently to render one amenable and responsible for his acts. Black's Law Dictionary 553 (4th ed. 1951).

Discretion implies the exercise of discriminating judgment within the bounds of reason. *Sanford v. Smith,* 11 Cal. App. 3d 991, 1000, 90 Cal. Rptr. 256 (1970). It involves the choice of exercising of the will, of determination made between competing and sometimes conflicting considerations. Discretion imparts that a choice of action is determined, and that action should be taken with reason and good conscience in the interest of protecting the rights of all parties and serving the ends of justice.

In *Robertson v. City of Topeka,* 231 Kan. 358, 644 P.2d 458 (1982), this court reviewed federal cases interpreting the "discretionary function" exception contained in the Federal Tort Claims Act, U.S.C. § 2671 *et seq.* (1982). We rejected the "planning level-operational level" test for the discretionary function. That test focused on the status of the governmental employee rather than the character of the act. *Dalehite v. United States,* 346 U.S. 15, 97 L.Ed. 1427, 73 S.Ct. 956 (1953). We chose instead another test: "whether the judgments of a Government employee are of 'the nature and quality' which Congress intended to put beyond judicial review." *Downs v. United States,* 522 F.2d 990, 997 (6th Cir. 1975). Applying either or both tests, under the facts of this case, the question is whether the officers' actions exceeded either the common-law duty of an officer or the exception to liability provided by the act.

The exceptions to liability of a governmental entity or employee set out in 75-6104 are not without limitations. Only negligent or wrongful acts or omissions of employees are excepted from liability by 75-6104, while acts or omissions involving more than the lack of ordinary care and diligence are not.

Defendants correctly state that, as a general rule, the duty of a law enforcement officer to preserve the peace is a duty owed to the public at large. Absent some special relationship with or specific duty owed an individual, liability will not lie for damages. *Robertson v. City of Topeka,* 231 Kan. at 363. Absent guidelines, police officers are vested with the necessary discretionary authority to act in an appropriate manner to protect the public.

Neither the courts nor our legislature, in passing the act, extended the mantle of immunity beyond the boundaries of protection previously recognized under the common law. Under the common law, personal liability was imposed on officers who maliciously or wantonly injured a person or his property even though the officers were engaged in a governmental function. *Robertson,* 231 Kan. at 364 (Fromme, J., dissenting).

A law enforcement officer is obligated to use reasonable and ordinary care and diligence in the exercise of his duties, to use his best judgment, and to exercise that reasonable degree of learning, skill and experience which is ordinarily possessed by other law enforcement officers in the same or similar locations. A law enforcement officer who acts maliciously or wantonly fails to exercise the reasonable and ordinary care and diligence required of a law enforcement officer and acts outside the protection afforded by the act.

In an action against a law enforcement officer, expert testimony is ordinarily required to establish that the officer acted maliciously or wantonly while the officer was engaged in his duties. There is a common knowledge exception to the rule requiring expert testimony in an action against a law enforcement officer. The common knowledge exception applies if what is alleged to have occurred in the officer's conduct is so obviously lacking in reasonable care and conduct and the conduct is so negligent that the malicious or wanton conduct causing the injury would be apparent to and within the common knowledge and experience of the public generally.

In granting summary judgment for the defendants, the trial court simply determined that the sheriff's officers and the county were immune from liability under the exceptions contained within the act. It did not determine whether a governmental function or a discretionary act had been exercised by the officers or whether that act was reasonable as opposed to capricious or arbitrary. The term "discretion" imparts the exercise of judgment, wisdom and skill, as distinguished from unthinking folly, heady violence and rash injustice. If the officers acted needlessly, maliciously or wantonly, resulting in injury to the plaintiff's property, the officers acted outside the protection of the act.

Plaintiffs' evidence included the deposition of an "expert" who concluded that the officers had failed to exercise the standard of care imposed upon the officers under the circumstances of this case. Whether this particular set of facts falls within any of the exceptions to liability for negligence created by 75-6104 or if the officers conduct was more than negligent, *i.e.*, malicious or wanton, and therefore outside the protection from liability, must be determined by considering the totality of the circumstances in this particular case. Plaintiffs are correct in contending that the trial court's granting of summary judgment concerning liability for damages to the plaintiffs' home was improper.

Plaintiffs alleged that they suffered physical distress in the form of insomnia, headaches, weight gain and general physical upset as a result of the events that occurred on July 29, 1981. They argue that they are entitled to damages for emotional distress even though they suffered no "physical impact." The defendants argue that the plaintiffs are not entitled to damages for emotional distress absent actual physical impact or trauma.

Recovery for emotional distress has generally been limited in Kansas. The rules were most recently discussed in *Hoard v. Shawnee Mission Medical Center,* 233 Kan. 267, 662 P.2d 1214 (1983). There plaintiffs were suing to recover under theories of negligent infliction of emotional distress or the tort of outrage for emotional and physical damages alleged to have been sustained when told their daughter had died, when she had not, but was critically injured and in another hospital. Following the general rule that there can be no recovery for emotional distress suffered by a plaintiff unless it is accompanied by or results from physical

injury to the plaintiff, recovery for damages was denied. See also *Schmeck v. City of Shawnee*, 231 Kan. 588, 647 P.2d 1263 (1982).

Some courts in other jurisdictions have allowed recovery for emotional distress where there has been direct injury to property. See Annot., 28 A.L.R.2d 1070. These courts have allowed a contemporaneous injury to or interference with property to be regarded as a substitute for the physical impact required under the general rules. Particularly where the defendant is charged with a willful tort rather than merely a negligent injury, and especially where the tort is committed under circumstances of positive malice or ill will which might reasonably be expected to lead to considerable mental disturbance to the plaintiff, compensatory damages for such mental disturbance or its physical consequences may be awarded. We, however, have never allowed recovery under such circumstances.

Under the facts of this case the trial court correctly granted summary judgment against the plaintiffs' claims for physical and emotional distress. The law as stated in *Hoard* and *Schmeck* controls.

Affirmed in part. Reversed in part. Remanded for further proceedings.

Prager, J., concurs in the result.