No. 66,580

GEORGE RAY MILLS and JUDY A. MILLS, in their individual capacities; and JUDY A. MILLS in her capacity as Administrator of the Estate of TIMOTHY R. MILLS, *Appellants*, v. CITY OF OVERLAND PARK, KANSAS; OVERLAND PARK POLICE OFFICER HUFFMAN; OVERLAND PARK POLICE OFFICER MOORE; OVERLAND PARK POLICE CHIEF SCAFE; KANSAS CITY SOCCER CONCESSION CORP., a Kansas Corporation; KANSAS CITY INDOOR SOCCER PARTNERSHIP, a Missouri Limited Partnership; THOMAS H. TWELLMAN; MICHAEL NEEDLEMAN; DAVID L. SHERMAN; and JILL E. MASIERO, *Appellees*.

(837 P.2d 370)

Opinion filed July 10, 1992.

*Timothy P. Orrick*, of Holbrook, Heaven & Fay, P.A., of Kansas City, argued the cause, and *Thomas M. Sutherland*, of the same firm, was with him on the briefs for appellants.

*Michael M. Shultz*, associate professor of law, University of Missouri-Kansas City School of Law, Kansas City, Missouri, argued the cause, and *Daniel B. Denk*, of McAnany, Van Cleave & Phillips, P.A., of Kansas City, *Deryl W. Wynn*, of the same firm, *Robert J. Watson*, city attorney, and *Michael R. Santos*, assistant city attorney, were with him on the briefs for appellees City of Overland Park, officers Huffman and Moore, and police chief Scafe.

*Howard D. Lay*, of Dysart Taylor Penner Lay & Lewandowski, P.C., of Kansas City, Missouri, argued the cause, and *Roger W. Penner*, of the same firm, was with him on the briefs for appellees Kansas City Soccer Concession Corp., Kansas City Indoor Soccer Partnership, Thomas H. Twellman, Michael Needleman, David L. Sherman, and Jill E. Masiero.

*James L. Eisenbrandt*, of Bryan Cave, of Leawood, was on the brief for *amicus curiae* Kansas Association of Chiefs of Police.

*James M. Kaup*, of Topeka, was on the brief for *amicus curiae* League of Kansas Municipalities.

The opinion of the court was delivered by

McFARLAND, J.: This is a wrongful death and survivorship action seeking damages arising from the death of Timothy R. Mills. The district court granted summary judgment in favor of the defendants, and plaintiffs appeal therefrom.

The facts may be summarized as follows. Timothy Mills was 19 years old at the time of the events in issue. On the afternoon of December 26, 1987, he and his friend Tom Tracy met and began drinking. They first went to the Shawnee Village Bowl, then drove around awhile drinking beer and wine coolers purchased from liquor stores.

At about 8:00 p.m., they went to Just for Kicks, an indoor soccer stadium. Mills purchased and consumed substantial quantities of alcoholic liquors and cereal malt beverages at the establishment's bar. Mills became disruptive and was escorted from the bar. He returned and some type of disturbance occurred. The bartender called the Overland Park Police Department for assistance.

Officer Huffman was the first on the scene. At this time, Mills was standing alone on the sidewalk in front of the facility. Mills advised the officer who he was and that he was 19 years old. No disturbance or confrontational incident occurred in the officer's presence. The weather was cold. Much ice was present and there was a freezing mist. Mills was wearing jeans, cowboy boots, and a flannel shirt. He did not have a coat. Two other officers had arrived—Cauley and Moore.

After conferring with members of the Just for Kicks staff, Huffman announced no charges were to be filed and Mills was free to go. Mills walked from the establishment into a field toward an industrial development. He was found frozen to death in a drainage ditch behind a building in the area the next morning. Other background facts will be set forth as needed for the discussion of particular issues.

This action was brought by Mills' parents and personal representative seeking damages against Just for Kicks, certain of its employees and a related entity for having sold alcoholic beverages to Mills, and against the City of Overland Park and certain police officers for having failed to take Mills into custody when he was incapacitated by alcohol and improperly dressed for the current weather conditions. The district court entered summary judgment in favor of all defendants, and the plaintiffs appeal therefrom.

Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. When a summary judgment is challenged on appeal, an appellate court must read the record in the light most favorable to the party who defended against the motion for summary judgment. *Patterson v. Brouhard*, 246 Kan. 700, 702-03, 792 P.2d 983 (1990); *Mick v. Mani*, 244 Kan. 81, 83, 766 P.2d 147 (1988). See *Ebert v. Mussett*, 214 Kan. 62, 65, 519 P.2d 687 (1974); *Lawrence v. Deemy*, 204 Kan. 299, 301-02, 461 P.2d 770 (1969); *Brick v. City of Wichita*, 195 Kan. 206, Syl. ¶ 1, 403 P.2d 964 (1965); *Moody Investments, Inc. v. Baldwin*, 12 Kan. App. 2d 686, 688-89, 754 P.2d 810, *rev. denied* 243 Kan. 779 (1988); K.S.A. 1991 Supp. 60-256(c).

If factual issues do exist, they must be material to the case to preclude summary judgment. *Bacon v. Mercy Hosp. of Ft. Scott,* 243 Kan. 303, 307, 756 P.2d 416 (1988). There is no claim that disputed factual issues as to any material fact barred the entry of summary judgment herein.

## LIABILITY BASED ON THE SELLING OF THE ALCOHOLIC BEVERAGES

The first issue concerns the propriety of the district court's entry of summary judgment in favor of Just for Kicks, its employees, and related entities. The district court held:

"1. The question of the liability of one furnishing intoxicating liquor to a minor for injuries caused by the minor's intoxication has been decided by the Kansas Supreme Court in *Ling v. Jan's Liquors,* 237 Kan. 629, 703 P.2d 731 (1985). The answer is an unequivocal 'no.' The decision was reaffirmed by the Supreme Court in *Fudge v. City of Kansas City,* 239 Kan. 369, 720 P.2d 1093 (1986), and *Thies v. Cooper,* 243 Kan. 149, 753 P.2d 1280 (1988)."

The bulk of the parties' arguments go to propriety of the *Ling v. Jan's Liquors,* 237 Kan. 629, 703 P.2d 731 (1985), decision. *Ling* involved a factual situation where a minor (Shirley) was sold alcohol in Missouri, drove his automobile into Kansas while intoxicated, and then struck a pedestrian, Lyllis Ling. The action was brought in Kansas, where the injury occurred, against the Missouri liquor store for having sold the alcohol. Much of the decision concerned the applicability of the Kansas long arm statute (K.S.A. 60-308), in conferring jurisdiction to Kansas, which has no relevance herein.

*Ling* is significantly different from the case before us in another respect. In *Ling,* a person injured by a tort committed by the intoxicated person was seeking recovery against the purveyor of the alcohol. Such third-party liability did not exist at common law and, where it does exist in this country, it is through enactment of what are known as civil liability or dram shop acts. Missouri has a dram shop act. Kansas does not. We held:

"At common law, and apart from statute, no redress exists against persons selling, giving or furnishing intoxicating liquor for resulting injuries or damages due to the acts of intoxicated persons, either on the theory that the dispensing of the liquor constituted a direct wrong or that it constituted

actionable negligence. Since Kansas does not have a dram shop act, the common-law rule prevails in Kansas." 237 Kan. 629, Syl. ¶ 3.

As we observed in *Ling*:

"Although empowered to change the common law in light of changed conditions, this court recognizes that declaration of public policy is normally the function of the legislative branch of government. Whether Kansas should abandon the old common-law rule and align itself with the new trend of cases which impose civil liability upon vendors of alcoholic beverages for the torts of their inebriated patrons depends ultimately upon what best serves the societal interest and need. Clearly, this is a matter of public policy which the legislature is best equipped to handle." 237 Kan. at 640.

In the case before us, recovery is not sought by a person injured by a tort of the inebriated person but is predicated on the death of the inebriated person himself. Thus, the dram shop legal concept is not involved herein.

One aspect of *Ling* is of particular significance herein, however. In *Ling*, liability was also sought under K.S.A. 41-715, which provides:

"(a) No person shall knowingly sell, give away, dispose of, exchange or deliver, or permit the sale, gift or procuring of any alcoholic liquor to or for any person who is an incapacitated person, or any person who is physically or mentally incapacitated by the consumption of such liquor.

"(b) Violation of this section is a misdemeanor punishable by a fine of not less than $100 and not exceeding $250 or imprisonment not exceeding 30 days, or both."

In *Ling*, we held, for reasons expressed therein, that K.S.A. 41-715 was intended to regulate the sale of liquor and was not intended to impose civil liability. 237 Kan. at 640. We adhere to that determination. This court's holding in *Ling* relative to K.S.A. 41-715 is, however, broader than just its application to the claim of a person injured by the tort of an inebriated person. As civil liability is not imposed by the statute, a civil action seeking recovery for injuries received by a third party, or on behalf of or arising from injury to the inebriated person himself or herself, cannot be predicated upon violation of the statute.

This brings us to the claim of liability predicated upon violation of K.S.A. 21-3610 (Ensley 1981), the statute in effect at the time of the incident herein, which provided:

"(1) Furnishing intoxicants to a minor is directly or indirectly, selling to, buying for, giving or furnishing any intoxicating liquor to any person under the age of twenty-one (21) years.

"(2) Furnishing intoxicants to a minor is a class B misdemeanor."

In 1988, the statute was amended to prohibit "alcoholic liquor" rather than "intoxicants." In 1989, 21-3610 was amended to create the following defense:

"(4) It shall be a defense to a prosecution under this section if: (a) The defendant is a licensed retailer, club, drinking establishment or caterer or holds a temporary permit, or an employee thereof; (b) the defendant sold the alcoholic liquor to the minor with reasonable cause to believe that the minor was 21 or more years of age; and (c) to purchase the alcoholic liquor, the minor exhibited to the defendant a draft card, driver's license, birth certificate or other official or apparently official document purporting to establish that such minor was 21 or more years of age." L. 1989 ch. 91, § 1.

K.S.A. 21-3610a prohibits the furnishing, etc., of cereal malt beverages to minors except by a parent or legal guardian and was similarly amended in 1989 to create the defense.

In *Ling*, the same version of 21-3610 was in effect as in the case before us. Reference to the statute appears in *Ling* as follows:

"Ling contends that the violation of K.S.A. 21-3610 and K.S.A. 41-715 (establishing criminal penalties for sale of alcoholic liquor to a minor) is a breach of a duty imposed by law and, thus, negligence per se. In other contexts this court has recognized the rule that breach of a duty imposed by law or ordinance is negligence per se, and that damages may be predicated on its violation if the breach is the proximate cause of the injury or damages or substantially contributes to the injury. *Arredondo v. Duckwall Stores, Inc.*, 227 Kan. 842, 610 P.2d 1107 (1980); *Kendrick v. Atchison, T. & S.F. Rld. Co.*, 182 Kan. 249, 260, 320 P.2d 1061 (1958). We decline to find negligence per se in this case since to do so would subvert the apparent legislative intention.

"The predecessor to K.S.A. 41-715 (of which K.S.A. 21-3610 was once a part) was first enacted in 1949, the same year the dram shop act was repealed. Since that time, the legislature, although it has considered it, has not re-created a civil cause of action in favor of those injured as a result of a violation of the liquor laws. Clearly, the legislature would have done so had it intended for there to be a civil cause of action. K.S.A. 41-715 prohibits the dispensing of intoxicating liquors to certain classes of persons and is a comprehensive act to *regulate* the manufacture, sale, and distribution of alcoholic liquors. The legislature did not intend for it to be interpreted to impose civil liability." 237 Kan. at 639-40.

No further reference is made to 21-3610 in *Ling*. The court's holding relative to K.S.A. 41-715 disposed of the claims made under 21-3610 although the latter statute appears in the Kansas Criminal Code (K.S.A. 21-3101 *et seq.*), while the former is contained in the Kansas Liquor Control Act (K.S.A. 41-101 *et seq.*). The statement in *Ling* that 21-3610 was once a part of K.S.A. 41-715 apparently was intended to tie the two statutes together and reference to only K.S.A. 41-715 was made thereafter.

We believe some additional discussion relative to 21-3610 is necessary. Mentioned in the concurring and dissenting opinion authored by Justice Lockett in *Ling* is *Arredondo v. Duckwall Stores, Inc.*, 227 Kan. 842, 610 P.2d 1107 (1980). In *Arredondo*, a minor purchased gunpowder in contravention of K.S.A. 21-4209. He was injured when a shotgun misfired. The defendant seller of the gunpowder was sued by the minor, seeking damages for his injury. The issue before us was not whether civil liability could be predicated upon violation of K.S.A. 21-4209 but, rather, whether or not the comparative negligence statute (K.S.A. 60-258a) applied. After a lengthy discussion of the legislative purpose in enacting the statute, we held that public safety was the primary purpose for its enactment as opposed to protection of the named class of minors, habitual drunkards, narcotic addicts, and felons. Thus, comparative negligence applied. Inasmuch as the protection of habitual drunkards, narcotic addicts, and felons is not a compelling public policy, this conclusion seems logical.

In the case before us, there is a strong public policy to keep intoxicating liquor from minors both to prevent the harm its excessive consumption can do to minors and to deter torts they might commit against others while inebriated.

If the minor who has been furnished gunpowder has a cause of action against the furnisher thereof for his injuries, then why is the same not true for the minor injured by his use of alcohol furnished him? We believe the answer lies in the nature of the risk and the historical development of the law relative to intoxicating liquors.

Gunpowder is an explosive with an inherent ability to harm. Proper handling and usage thereof is a learned skill deemed to require a certain maturity. Intoxicating liquor presents risks but

of a different nature. The major risk of furnishing liquor to a minor is not that consumption thereof, even in the extreme cases, will cause death or injury to the minor in and of itself, but that under the influence thereof the minor will do or not do acts necessary for the safety and well-being of himself or herself, or others.

Of significance is K.S.A. 1987 Supp. 41-727, in effect at the pertinent time herein, which provided:

"(a) Except with regard to serving of alcoholic liquor as permitted by K.S.A. 41-308a, 41-2610 or K.S.A. 1987 Supp. 41-308b, and amendments thereto, no person under 21 years of age shall possess, consume, obtain, purchase or attempt to obtain or purchase alcoholic liquor except as authorized by law.

"(b) Violation of this section by a person 18 or more years of age but less than 21 years of age is a misdemeanor punishable by a fine of not less than $100 nor more than $250. In addition to such fine, the court may order the offender to perform 40 hours of public service.

"(c) Any person less than 18 years of age who violates this section is a juvenile offender under the Kansas juvenile offenders code. Upon adjudication thereof and as a condition of disposition, the court shall require the offender to pay a fine of not less than $100 nor more than $250. In addition to such fine, the court may order the offender to perform 40 hours of public service.

"(d) This section shall be part of and supplemental to the Kansas liquor control act."

K.S.A. 1987 Supp. 41-2721 contains comparable provisions relative to the consumption of cereal malt beverages by minors. Comparable provisions relative to a minor's possession, purchase, and consumption of both alcoholic liquor and cereal malt beverages are now combined in K.S.A. 1991 Supp. 41-727. Thus, at the pertinent time herein, the Kansas Liquor Control Act (K.S.A. 41-101 *et seq.*) declared the following acts to be unlawful:

1. The sale or furnishing of alcoholic liquor to certain incapacitated persons (K.S.A. 41-715); and

2. for a person under the age of 21 to obtain, purchase, consume, or possess alcoholic liquor (K.S.A. 1987 Supp. 41-727) or cereal malt beverages (K.S.A. 1987 Supp. 41-2721).

The legislature has not made the purchase, possession, consumption, etc., by a minor of gunpowder an unlawful act on the part of the minor. The minor, on the other hand, has been made criminally responsible for his or her purchase, possession, and

consumption of liquor and cereal malt beverages. The repeal of the dram shop act coupled with the enactment of laws criminalizing the minor's purchase, possession, and consumption do not support the argument that it was the legislative intent that the sale of liquor to a minor gives rise to civil liability for injury to the minor from the sale or furnishing of the liquor.

Alcoholic liquor is something of an anomaly. Throughout recorded history, its excessive consumption has been the cause of inestimable suffering, misery, and injury, but no law has successfully dealt with it. The so-called noble experiment of Prohibition by the enactment of the Eighteenth Amendment to the United States Constitution did not solve the problem and created some new ones, and the amendment was ultimately repealed.

The English common law imposed no tort liability on the furnisher of liquor on the theory that the drinking of the liquor, not the furnishing of it, is the proximate cause of the injury. 45 Am. Jur. 2d, Intoxicating Liquors § 553.

In possible civil liability terms, the breadth of 21-3610 is enormous. The minor furnished the liquor could be a 1-year-old infant or that infant's 20-year-old father. The furnisher could be a tavern, or the host of a wedding reception where alcoholic beverages were available to all guests. Further, as held in *State v. Robinson*, 239 Kan. 269, 272, 718 P.2d 1313 (1986), knowledge of the age of the minor is unnecessary for a criminal conviction under K.S.A. 21-3610. Presumably then, civil liability predicated on violation of the act would likewise not require knowledge of the minor's age. The subsequent amendments to 21-3610 and -3610a give a measure of protection to those in the business of selling liquor or cereal malt beverages in this regard, but none to ordinary citizens.

There are other public policy concerns herein. There is no logic in holding that an intoxicated person who is under 21 years of age can recover for his or her own injuries from the furnisher of the liquor but those injured by the intoxicated person cannot. Had an intoxicated minor driver struck a pedestrian (as occurred in *Ling*) and himself been injured or killed in the accident, the wholly innocent injured pedestrian would have no cause of action against the furnisher of the liquor, but the drunken driver of the vehicle would. If the negligence per se versus comparative fault

rationale in *Arredondo* would be followed herein, and 21-3610 be interpreted to mandate negligence per se, an even more incongruous result could be reached. The drunken driver could be held 100 per cent at fault for the pedestrian's injuries under comparative negligence principles, and the liquor supplier held 100 per cent at fault for the drunken driver's injuries under negligence per se.

The enormous difficulty in dealing with civil liability arising from the furnishing of intoxicating liquor is demonstrated in reviewing Annot., Furnishing Intoxicating Liquor—Liability, 98 A.L.R.3d 1230. Every possible legal position appears therein as the law in other jurisdictions.

We conclude that in enacting 21-3610, the legislature did not intend to impose civil liability for violations thereof. If such liability is to be imposed, under some or all circumstances, then we conclude, as we did in *Ling*, that this is a decision to be made by the legislature.

## LIABILITY OF GOVERNMENTAL DEFENDANTS

For their second issue, the plaintiffs challenge the entry of summary judgment in favor of the City of Overland Park and the various individual police officer defendants. The heart of their claim is that, under the circumstances, the officers had a duty to take Mills into custody for his own protection. The district court entered summary judgment for the governmental defendants on the grounds: (1) no special duty was owed to Mills under the public duty doctrine; and (2) the discretionary function exception to liability (K.S.A. 75-6104[e]) under the Kansas Tort Claims Act (K.S.A. 75-6101 *et seq.*) granted immunity.

In granting summary judgment in favor of these defendants, the district court made the following findings of fact relative to the police officers' contact with Mills:

"1. In the evening hours of December 26, 1987, officers were summoned to the Just for Kicks Soccer Club in Overland Park, Kansas, on a disturbance call.

"2. Upon arrival, Officer Huffman observed Timothy Mills standing outside the soccer club.

"3. Mills was 19 years of age at the time.

"4. Officer Huffman approached Mills and spoke with him briefly, concluding that he was intoxicated.

"5. Officers Cauley and Moore arrived shortly, and they both spoke with Mills outside the club, while Officer Huffman went inside to speak with employees of the club about the disturbance.

"6. All three officers could smell alcohol on Mills' breath, and Officers Huffman and Moore described his behavior as 'cocky' and 'argumentative.'

"7. Mills had told Officer Huffman that he was only nineteen when Officer Huffman first arrived.

"8. Officer Huffman had determined, through conversations with employees of Just for Kicks, that Mills and his friend, Tom Tracy, had been drinking together in the club's bar that night. Huffman did not believe that Tracy was intoxicated, but he arranged for him to use the club's phone to call for a ride home.

"9. Soccer club employees told Officer Huffman that everything was all right, so Huffman determined he would not detain Mills and told him . . . he was free to go. Officer Huffman told Mills that Tracy was calling for a ride home, and Huffman believed that Mills was 'in control of himself and was fine.'

"10. Officer Cauley then left the scene, and Officers Moore and Huffman remained there in their respective cars to write up their reports. Huffman's report notes that Mills was 'obviously very intoxicated,' and Moore's report describes him as 'apparently intoxicated.'

"11. As Officer Moore wrote his report, he saw Mills walk across the parking lot and head into an open field north of the soccer club. Mills was not wearing a coat, even though a freezing mist was falling.

"12. Officer Moore was curious about Mills' reason for walking across the field to an industrial development, so he drove his car around to the industrial area to check it out. He could not see Mills, nor could he get his car into the parking lot of the building behind which he had seen Mills disappear, because the parking lot was a sheet of ice. He therefore returned to the police station.

"13. Tim Mills was found frozen to death at the bottom of a drainage ditch behind that building the next afternoon."

None of these findings are controverted. The district court then found the following relative to the applicable provisions of the police manual in effect at the time:

"14. On December 26, 1987, the Overland Park Police Department had in effect a Standard Operating Procedure (SOP 200-13) which established a procedure for officers to follow in handling a person believed to be incapacitated by alcohol or drugs. The operative portions of SOP 200-13 are set forth below:

" 'PURPOSE:
To establish a procedure for handling of persons to be incapacitated by alcohol or drugs.

" 'STATUTORY REFERENCE:

"Intoxicated Individual" - is an individual whose mental or physical functioning is substantially impaired as a result of the use of alcohol .or drugs.

"Incapacitated by Alcohol or Drugs" - means that an individual, as the result of the use of alcohol or drugs, is .unconscious or has impaired judgment so that:

    a. such individual is incapable of realizing and making a rational decision with respect to such individual's need for treatment; or

    b. such individual lacks sufficient understanding or capacity to make or communicate responsible decisions concerning either such individual's well-being or estate.

"Custody"—in an emergency hospitalization case does not mean arrest.

" 'PROCEDURE:

Any officer who, upon observation, reasonably believes a person is intoxicated or is incapacitated by alcohol or drugs and, as a result, is likely to do physical harm to himself or others, may take that person into custody without a warrant.'

"The SOP goes on to instruct officers that, if an intoxicated person is taken into custody, they may release the person to a friend or relative, allow him to check into the Substance Abuse Services detox center, or commence involuntary commitment proceedings." .

We shall first determine whether or not a cause of action in tort is stated. A tort is a violation of a duty imposed by law. *Guarantee Abstract & Title Co. v. Interstate Fire & Cas. Co.*, 232 Kan. 76, 79, 652 P.2d 665 (1982).

In *Hendrix v. City of Topeka*, 231 Kan. 113, 643 P.2d 129 (1982), the decedent, a former Topeka State Hospital patient, had appeared at the hospital and demanded admission. This was denied and Topeka police were summoned and requested to remove the former patient from the grounds. This was done. Later the former patient was found frozen to death in a Topeka park. Liability was sought, *inter alia*, against the City of Topeka for the actions of its police officers. We stated:

"Broadly speaking, a police officer has immunity from liability on claims by individuals arising from the performance or nonperformance of an officer's general duties such as enforcement of law and crime prevention. Liability arises only where an officer breaches a specific duty owned to an individual. Put another way, an officer must owe an affirmative duty to an individual before he may be held liable." 231 Kan. at 120.

There was no allegation in *Hendrix* that the decedent had been transported to a remote area and left helpless. He was simply removed from the hospital grounds.

In *Fudge v. City of Kansas City*, 239 Kan. 369, 720 P.2d 1093 (1986), we discussed liability based upon failure of police to take an intoxicated person into custody. We stated:

"In order for an individual to be liable for a negligent or wrongful act, there must be a duty to act. Appellants, relying upon the 'public duty doctrine,' argue the City of Kansas City and its police officers did not owe a duty of care to James Fudge. The public duty doctrine provides a governmental entity is not liable for torts committed against a person in absence of a special duty owed to the injured party. Under this doctrine, the police officers owed a duty to the public at large, rather than to any individual . . . .

"Appellants find support for their argument in *Hopkins v. State*, [237 Kan. 601, 611, 702 P.2d 311 (1985)], where we stated:

" 'Defendants correctly state that, as a general rule, the duty of a law enforcement officer to preserve the peace is a duty owed to the public at large. *Absent some special relationship with or specific duty owed an individual, liability will not lie for damages. Robertson v. City of Topeka*, 231 Kan. at 363. *Absent guidelines*, police officers are vested with the necessary discretionary authority to act in an appropriate manner to protect the public.' " (Emphasis added.) 239 Kan. at 372.

*Fudge* was a wrongful death action arising out of an automobile accident wherein the decedent's vehicle was struck by one driven by Delmar Henley, the intoxicated person the police had not taken into custody.

A special duty was held to exist because of the applicable police standard operating manual, which provided in pertinent part:

" 'An individual, male or female, who is incapacitated by alcohol or drugs, and because of such condition, is likely to do physical injury to himself or herself or others if allowed to remain at liberty *will* be taken into protective custody and processed in the following manner . . . .' " (Emphasis supplied.) 239 Kan. at 372-73.

Based upon this manual provision, we held the police had a duty to take Henley into protective custody under the circumstances.

The Standard Operating Procedure (SOP) manual in *Fudge* stated the intoxicated person *will* be taken into protective custody. The SOP manual herein states the intoxicated person *may* be taken into custody. The district court held that the will/may language was crucial. We agree. The use of "will" is an order to act, removing the officer's discretion and creating a special duty. The use of "may" is not a discretion to act, but a grant of authority

to act if the officer deems such action to be appropriate. No special duty is thereby created.

Deprivation of a person's liberty that is protected by the Fifth Amendment to the United States Constitution is a drastic action. A law enforcement officer's right to arrest is governed by K.S.A. 22-2401, which provides:

"A law enforcement officer may arrest a person under any of the following circumstances:

"(a) The officer has a warrant commanding that the person be arrested.

"(b) The officer has probable cause to believe that a warrant for the person's arrest has been issued in this state or in another jurisdiction for a felony committed therein.

"(c) The officer has probable cause to believe that the person is committing or has committed:

(1) A felony; or

(2) a misdemeanor, and the law enforcement officer has probable cause to believe that:

(A) The person will not be apprehended or evidence of the crime will be irretrievably lost unless the person is immediately arrested;

(B) the person may cause injury to self or others or damage to property unless immediately arrested; or

(C) the person has intentionally inflicted bodily harm to another person.

"(d) Any crime, except a traffic infraction, has been or is being committed by the person in the officer's view."

K.S.A. 65-4026 concerns voluntary treatment of intoxicated persons and provides, in part:

"(a) An intoxicated person may come voluntarily to a public treatment facility or state institution for emergency treatment. *A person who appears to be intoxicated in a public place and to be in need of help, if the person consents* to the proffered help, *may be assisted* to such person's home, a public treatment facility or state institution, a private treatment facility, or other health facility or state institution *by a law enforcement officer* or the emergency service patrol.

. . . .

"(e) The *law enforcement officer* or members of the emergency patrol who act in compliance with this section are acting in the course of their official duty and *shall not be held criminally or civilly liable therefor.*" (Emphasis supplied.)

K.S.A. 65-4027 concerns involuntary or emergency detention of intoxicated persons and provides, in part:

"(A) Any law enforcement officer who has reasonable belief, upon observation, that any individual is intoxicated or incapacitated by alcohol and

because of this condition is likely to be physically injured or to physically injure others if allowed to remain at liberty may take such individual into custody without a warrant. The officer shall transport such individual to any treatment facility, or other facility for care or treatment, which has a physician or psychologist on staff where such individual shall be examined by a physician or psychologist at such facility."

Medical personnel then determine if such individual is a danger to him or herself or others and needs to be detained involuntarily.

The SOP manual herein with its grant of authority that the officer "may" take the intoxicated person into custody is consistent with K.S.A. 65-4027. Neither mandates or directs that any person be taken into custody but is merely a grant of authority to act.

We conclude that the governmental defendants owed no special duty to Timothy Mills to take him into custody. Likewise, Mills had no right to be taken into protective custody.

It should be noted, before leaving this point, that plaintiffs contend that the police had taken Mills into custody and then released him under circumstances contrary to the manual. We do not agree. The police were called to the scene on a report of a disturbance. When they arrived, Mills was out in front of the establishment and no disturbance or confrontational incident was in progress. They talked to Mills and the establishment's employees and concluded *no charges would be filed* and that Mills was then free to leave. If Mills had been detained, it was merely investigational in nature for possible criminal arrest. There is nothing in the record that Mills had been, at any time, taken into protective custody as an intoxicated person.

The City of Overland Park and the officer defendants urge us to follow the reasoning of *amicus curiae* and hold that *Fudge* has been either overruled or modified by the 1987 amendment to K.S.A. 75-6104. L. 1987, ch. 353, § 3. This is the first post-*Fudge* 75-6104(d) case to reach this court. The effect of 75-6104(d) on *Fudge* was not argued to the trial court. By virtue of having concluded that plaintiffs have no cause of action in tort against the governmental defendants, we need not determine the issues relative to the Kansas Tort Claims Act (K.S.A. 75-6101 *et seq.*).

The judgment is affirmed.

ABBOTT, J., concurring and dissenting: I concur with the majority's result pertaining to the City of Overland Park and its

police officers. I dissent from the result concerning the bar and its employees.

I have some dissatisfaction with our current law concerning liability for the action of, or lack of action by, police officers. Governmental bodies should be encouraged to set law enforcement guidelines that are compassionate and protective of the public. I view as counterproductive Syllabus ¶ 3 and the corresponding part of the opinion in *Fudge v. City of Kansas City*, 239 Kan. 369, 720 P.2d 1093 (1986), which holds that officers and governmental units are liable if specific mandatory guidelines have been adopted. It is counterproductive in that *Fudge* encourages, if not mandates, that a governmental agency never establish mandatory guidelines for its employees. That is not the message we should be sending. We should encourage whatever will provide the best possible law enforcement commensurate with protecting the public and private rights.

If a municipality and individual officers are to be held liable, liability should be based on a duty applicable to all municipalities and all officers similarly situated. The duty should be independent of and regardless of language in a manual.

Generally, a private citizen can coldly watch another person die even if the death could be prevented without endangering the private citizen. To me, a police officer has a duty to act if it would be apparent to anyone that death or serious injury *will* result, as opposed to a possibility if the officer does not act. Under those circumstances, there should be liability for the officer's failure to act. We hire law enforcement officers to solve crimes, keep the peace, and protect the public. They deserve, and should have, the public support in doing so, but the protection from liability for their actions should not be without limit.

This is not the case here. The officers were faced with a routine call. The testimony was that the officer thought the deceased was heading toward an open service station where shelter and a telephone were available. Therefore, I concur with the majority's result concerning the City of Overland Park and its police officers.

I dissent from affirming summary judgment in favor of the bar and its employees.

It is important to emphasize that the rules adopted by the majority would apply to the following scenario. A bar and its

employees can sell liquor to a person they know is 13 years of age; can sell the child 9 to 10 shots of alcohol, as happened in this case; and can throw the child out of the establishment, if the child then becomes rowdy, without fear of liability for injury or death inflicted by or resulting to the child as a consequence of being intoxicated because of the illegal sale of intoxicating liquor to a person known to be a child.

Here, the bar was being operated by an underage shift manager, who was too young to purchase a drink in the bar he was operating. In the space of a little over one hour, the shift manager and a waitress sold the deceased minor 9 or 10 shots of whiskey and 4 or 5 beers.

I would adopt the views expressed by Justice Lockett in his dissent in *Ling*. The economic burden caused by and to intoxicated minors should be borne by those who caused the loss and not by the innocent victims or the public at large.

Concerning the bar and its employees, I would reverse and remand for trial.

LOCKETT, J., joins the foregoing concurring and dissenting opinion.