No. 85,861

Matthew J. Prime, *Appellant*, v. Beta Gamma Chapter of Pi Kappa Alpha, a Kansas Voluntary Association, Pi Kappa Alpha Fraternity, a Tennessee Mutual Organization, Todd Guerrieri, Jeff Fay, Brian Harper, Cory Aubuchon, John Kosciuluk, Aaron Harper, and The Mount Oread House Corporation, a Kansas Corporation, *Appellees*.

(47 P.3d 402)

Opinion filed May 31, 2002.

*Theodore J. Lickteig*, of Law Offices of Theodore J. Lickteig, of Overland Park, argued the cause and was on the brief for appellant.

*Brian G. Boos*, of Gehrt & Roberts, Chartered, of Topeka, argued the cause for individual appellees, and *Craig C. Blumreich*, of the same firm, for appellee Brian Harper; *John E. Bordeau* and *Jana V. Richards*, of Sanders Conkright & Warren LLP, of Kansas City, Missouri, for appellee Jeffrey Fay; and *Wayne E. Smith*, of Dougherty, Modin & Holloway, of Kansas City, Missouri, for appellees Cory Aubuchon, John Kosciuluk, and Todd Guerrieri, and were on the briefs of individual appellees.

*Michael K. Seck*, of Fisher, Patterson, Sayler & Smith, L.L.P., of Overland Park, argued the cause and was on the brief for appellees Mount Oread House Corporation and Pi Kappa Alpha Fraternity.

*Rod L. Eisenhauer*, of Seigfreid, Bingham, Levy, Selzer & Gee, P.C., of Kansas City, Missouri, argued the cause and was on the brief for appellee Beta Gamma Chapter of Pi Kappa Alpha.

The opinion of the court was delivered by

ALLEGRUCCI, J.: This personal injury action arose out of a fraternity initiation event where Matthew Prime excessively consumed alcoholic beverages, which led to his hospitalization. Prime sued the local chapter and the national organization of the fraternity, the corporate owner of the real property where the fraternity chapter is housed, five individual fraternity members, the University of Kansas, and the Board of Regents. The university and regents were dismissed by Prime. Prime appeals from the trial court's order dismissing the local chapter and the trial court's order granting summary judgment to the remaining defendants. This court transferred the case from the Court of Appeals. K.S.A. 20-3018(c).

Matthew Prime was a 19-year-old pledge of the Beta Gamma chapter of Pi Kappa Alpha fraternity at the University of Kansas when he attended Pledge Dad Night at the fraternity house. Prime was provided alcoholic beverages in large quantities and encouraged but not required to drink them during the occasion. Prime drank excessively and lost consciousness. Fraternity members took Prime to the hospital. Prime was hospitalized with a blood alcohol concentration of .294. He alleged that he incurred medical expenses but no permanent injuries.

The district court's findings of fact specific to the various defendants will be set out where necessary to the discussion of the issues.

Prime raises four issues on appeal: (1) Is Beta Gamma chapter, an unincorporated association, a legal entity that can be sued; (2) did the district court erroneously enter summary judgment in favor of the individual fraternity member defendants; (3) did the district court erroneously enter summary judgment in favor of Pi Kappa Alpha; and (4) did the district court erroneously enter summary judgment in favor of Mount Oread House Corporation?

The district court granted Beta Gamma Chapter's motion to dismiss on the ground that the chapter is an unincorporated association, which cannot be sued in the name of the association. The district court's decision involved only a question of law, and this court's review is unlimited.

In *Kansas Private Club Assn. v. Londerholm*, 196 Kan. 1, 408 P.2d 891 (1965), the court stated: "It is the general rule to which this jurisdiction has long adhered, that in the absence of a statute to the contrary, an unincorporated association is not a legal entity and can neither sue nor be sued in the name of the association. [Citations omitted.]" 196 Kan. at 3. Prime contends that after the decision in *Kansas Private Club Assn.* was issued, a statute was enacted that superseded the general rule stated in the case.

The statute cited by Prime is K.S.A. 60-223b, which became effective on publication in the Kansas Reports and in K.S.A. 1969 Supp. It provides:

"An action brought by or against the members of an unincorporated association as a class by naming certain members as representative parties may be maintained only if the court is satisfied that the representative parties will fairly and adequately protect the interests of the association and its members. In the conduct of the action the court may make appropriate orders corresponding with those described in K.S.A. 60-223 (d), and the procedure for dismissal or compromise of the action shall correspond with that provided in K.S.A. 60-223 (e)."

K.S.A. 60-223b plainly applies only to class actions.

Prime recognizes that a decision issued by the Court of Appeals long after K.S.A. 60-223b became effective cites *Kansas Private Club Assn.* and follows the general rule stated in that case. See *Frey, Inc. v. City of Wichita*, 11 Kan. App. 2d 116, 715 P.2d 417

(1986). In *Frey*, now-Justice Abbott wrote for the Court of Appeals that a homeowners association "was never incorporated; therefore, it is not a legal entity and can neither sue nor be sued in the name of the Association." 11 Kan. App. 2d at 117.

The rule in Kansas is that an unincorporated association can neither sue nor be sued, and K.S.A. 60-223b does not affect application of the rule in this nonclass action. The district court properly dismissed Prime's claims against the Beta Gamma Chapter of the Pi Kappa Alpha fraternity.

Prime next contends that Fay, Guerrieri, Aubuchon, Kosciuluk, and Harper owed him a duty not to haze him and a duty not to provide beer and liquor in harmful quantities. The district court entertained three motions for summary judgment from the individual defendants and granted each of the motions.

With regard to Fay, the district court wrote:

"The Court finds that Kansas does not recognize a cause of action against Jeff Fay for negligently furnishing liquor to Matthew Prime, a minor, pursuant to *Mills v. City of Overland Park*, 251 Kan. 434, 837 P.2d 370 (1992). The Court further finds no authority supporting a cause of action against defendant Fay for hazing pursuant to K.S.A. 21-3434. Based upon the uncontroverted facts submitted by defendant Fay and admitted by plaintiff, Mr. Prime had very little interaction with Jeff Fay on Pledge Dad Night. Plaintiff further admitted that Jeff Fay did not do or say anything to encourage him to drink and was informed while in Jeff Fay's room on Pledge Dad Night that he did not have to drink if he didn't want to. This Court further finds that defendant Fay had no legal duty to prevent plaintiff from injuring himself due to the ingestion of alcohol."

With regard to Guerrieri, Aubuchon, and Kosciuluk, the district court repeated that Kansas courts do not recognize a cause of action for furnishing alcoholic beverages to a minor and cited *Mills*. The district court further stated that Prime voluntarily consumed alcoholic beverages to the levels that made him ill and that Guerrieri, Aubuchon, and Kosciuluk owed Prime no duty.

In ruling for Harper, the district court made the following findings of fact and conclusions of law:

"Findings of Uncontroverted Fact

"1. At the time of the incident in question the Plaintiff was a pledge seeking admission to membership in Pi Kappa Alpha.

"2. The Plaintiff was nineteen years of age on the date of the incident in question.

"3. The Plaintiff had consumed alcoholic beverages prior to the incident in question both in high school and college.

"4. Prior to the incident in question the Plaintiff had been intoxicated on more than one occasion and was familiar with the signs of becoming intoxicated.

"5. When the Plaintiff arrived at Pi Kappa Alpha the evening of February 26, 1997 for his assigned duties and study time he learned that Pledge Dad Night would take place that evening.

"6. Pledge Dad Night was a social function customarily held by Pi Kappa Alpha to introduce pledges to their assigned pledge fathers.

"7. The Plaintiff understood that the function of a pledge dad in the fraternity would be an active member of the fraternity who could provide advice to the pledge son. Plaintiff had requested Brian Harper to be assigned as his pledge dad.

"8. On the evening of Pledge Dad Night the pledges, including the Plaintiff, went from room to room in the fraternity to ask questions of person in those rooms seeking to obtain information as to the identity of their respective pledge dads. Alcohol was available for the pledges to consume in each of these rooms.

"9. The Plaintiff was told he did not have to drink if he did not want to but, 'if you want to drink that would be fine because it will be "the time of your life." The Plaintiff cannot recall who actually told him drinking would make Pledge Dad Night the time of his life.'

"10. No one in the fraternity told the Plaintiff that he would have to drink alcoholic beverages to participate in Pledge Dad Night or to become a member Pi Kappa Alpha. The Plaintiff consumed alcoholic beverages because of what he perceived to be 'peer pressure' and to 'fit in.'

"11. The Plaintiff spent only about five minutes with Brian Harper during Pledge Dad Night. Brian Harper was in the sixth and last room.

"12. In the last room, Brian Harper told the Plaintiff that Harper was his pledge dad and handed him a bottle of Mad Dog 20/20. It was traditional for pledge dads to provide a bottle of Mad Dog 20/20 to their pledge sons. Brian Harper did not request or suggest that the Plaintiff open the bottle or drink out of it. The Plaintiff did not seek any advice from Brian Harper. After spending a total of approximately five minutes total in the room the Plaintiff and Brian Harper went downstairs to join other fraternity members in singing fraternity songs.

"13. Brian Harper returned to his room after a short period of time to study for a test the next morning. He did not participate in or supervise any of the pledge activities that evening.

"14. Brian Harper did not hold an office in the fraternity having anything to do with setting up, organizing or supervising Pledge Dad Night.

"15. Brian Harper went downstairs at approximately 1:00 a.m. and found the Plaintiff passed out in the living room. He then, with the assistance of two other fraternity members, took the Plaintiff to Lawrence Memorial Hospital in Brian Harper's vehicle.

"16. Dr. Lida Osbern, the emergency room physician who treated the Plaintiff at Lawrence Memorial Hospital, stated in her records and testified in her deposition that Plaintiff told her his intoxication 'had nothing to do with hazing and that he was told he did not have to drink alcohol if he did not want to.'

"Conclusions of Law

"1. The Plaintiff's claim against the individual Defendants is that they were negligent in 'not exercising reasonable care in conducting an initiation ceremony known as Pledge Dad Night' and 'negligent in their performance of the ceremony in that the Plaintiff was led through more rooms than the other pledges which resulted in him consuming more alcohol than the other pledges.'

"2. There is no evidence in the discovery record that Brian Harper was at all involved in leading the pledges through the rooms since he remained in one room the entire time. Accordingly, Brian Harper has established an absence of evidence with respect to this claim and is entitled to summary judgment. *Crooks v. Greene*, 12 Kan. App. 2d 62, 64, 736 P.2d 78 (1987).

"3. Brian Harper was not an officer of the fraternity and played no part in organizing, conducting or supervising the activities of Pledge Dad Night. Brian Harper has established an absence of evidence to support this claim against him and is entitled to summary judgment.

"4. Brian Harper did hand the Plaintiff a bottle of Mad Dog 20/20. The Court, however, does not believe the law in Kansas recognizes a cause of action against an individual for furnishing an alcoholic beverage to another individual. In *Mills v. City of Overland Park*, 251 Kan. 434, 837 P.2d 370 (1992), the nineteen year old decedent entered a bar and was served nine or ten shots of whiskey and four or five beers in the space of a little over one hour. After being escorted from the bar due to disruptive conduct, he wandered off and was found frozen to death in a drainage ditch behind the building the next morning. In holding that the bar was not liable for furnishing liquor to the nineteen year old decedent, the Kansas Supreme Court held:

'There is no logic in holding that an intoxicated person who is under twenty-one years of age can recover for his or her own injuries from the furnisher of the liquor but those injured by the intoxicated person cannot. Had an intoxicated minor driver struck a pedestrian (as occurred in *Ling*) and himself been injured or killed in the accident, the wholly innocent injured pedestrian would have no cause of action against the furnisher of the liquor, but the drunken driver of the vehicle would. . . . If such liability is to be imposed, under some or all circumstances, then we conclude, as we did in *Ling*, that this is a decision to be made by the legislature. (251 Kan. at 442-43)'

"5. The cases from other jurisdictions cited by the Plaintiff are not persuasive in light of the clear Kansas precedent disallowing a right of recovery for furnishing liquor in circumstances much more egregious than those present in this case. This Court is duty-bound to follow Kansas law in the absence of some indication that

the Kansas Supreme Court is departing from its previously expressed position. *Mercer v. Fritts*, 9 Kan. App. 2d 232, 676 P.2d 150, affirmed 236 Kan. 73 (1984).

"6. In all of the cases relied upon by the Plaintiff there was a strong element of coercion that the Court finds was not present in this case as a matter of law. The Plaintiff admits Brian Harper never told him to drink and he was told repeatedly by members of the fraternity that he was not required to consume alcoholic beverages. The Court does not believe the mere fact someone in the fraternity told the Plaintiff if he would drink it would be the 'time of his life' would cause the Kansas Supreme Court to depart from its prior rulings that there is no common law or statutory cause of action in this state for furnishing intoxicants to another.

"7. The Court finds based upon the uncontroverted facts that Brian Harper owed no duty and breached no duty to the Plaintiff based upon the events and occurrences of February 26, 1997."

On appeal, Prime does not challenge the district court's findings of fact with regard to any of the individual defendants. He contends that the individuals owed a duty of care to him, and he recognizes that the existence of a duty is a question of law. This court's review of questions of law is unlimited, and its review of the district court's orders granting summary judgment in favor of the individual defendants on strictly legal grounds is unlimited.

Prime's argument is not easy to grasp. It seems he would have us narrowly construe *Ling v. Jan's Liquors*, 237 Kan. 629, 703 P.2d 731 (1985), to apply only to negligence per se for violations of K.S.A. 21-3610 and K.S.A. 21-3610a and *Mills v. City of Overland Park*, 251 Kan. 434, 837 P.2d 370 (1992), to apply only to negligence per se for violations of K.S.A. 41-715. Prime then would have the court adopt the reasoning and result of cases from other states' courts.

The holding in *Ling* was that Kansas law does not provide a cause of action against the suppliers of alcohol for persons injured as a result of the torts of intoxicated patrons, even underage patrons. Ling was severely injured when she was struck by a vehicle driven by 19-year-old Richard Shirley, who was inebriated from an alcoholic beverage purchased at Jan's Liquors. 237 Kan. at 630. Ling sued Jan's Liquors alleging negligence on the part of the vendor in selling alcohol to a minor whose intoxication resulted in the injurious accident. The district court dismissed the petition for failure

to state a claim on which relief could be granted, and this court affirmed. 237 Kan. at 630. The court reasoned that Kansas does not have a dramshop act, and the court declined to judicially impose third-party liability on suppliers of alcohol for the torts of intoxicated patrons on the ground that it was a policy matter better suited to legislative consideration. 237 Kan. at 640-41. Three members of the court, Justices Lockett, Prager, and Miller, disagreed. 237 Kan. at 642-47. The dissenters believed that Ling stated a cause of action against the liquor vendor because the vendor violated K.S.A. 41-715, which forbids the sale of alcoholic liquor to a minor, and the vendor should bear responsibility for the damage caused as a result of the violation. 237 Kan. at 647.

K.S.A. 41-715 provides:

"(a) No person shall knowingly sell, give away, dispose of, exchange or deliver, or permit the sale, gift or procuring of any alcoholic liquor to or for any person who is an incapacitated person, or any person who is physically or mentally incapacitated by the consumption of such liquor.

"(b) Violation of this section is a misdemeanor punishable by a fine of not less than $100 and not exceeding $250 or imprisonment not exceeding 30 days, or both."

K.S.A. 41-715, along with K.S.A. 21-3610 and 21-3610a, was considered by the court in *Mills* as well as in *Ling*.

The holding in *Mills*, a 1992 case, was that Kansas law does not provide a cause of action against a supplier of alcohol for the alcohol-related death of a minor patron. After consuming large quantities of alcohol, Mills became disruptive and was escorted from a bar. The following morning, Mills, who was 19 years old, was found frozen to death behind a building in the area. The court found one aspect of *Ling*, which was the determination that there was no liability under K.S.A. 41-715, to be of particular significance in its consideration of the wrongful death claim. 251 Kan. at 438. The court also considered whether liability could be predicated on a violation of K.S.A. 21-3610 or K.S.A. 21-3610a and concluded that the legislature had not intended to impose civil liability for violations of the statute. 251 Kan. at 443. Two members of the court, Justices Lockett and Abbott, disagreed. 251 Kan. at 448-50. The dissenters believed that the court should recognize a cause of ac-

tion against the bar and its employees for furnishing alcoholic beverages to the minor. 251 Kan. at 450.

K.S.A. 21-3610 prohibits furnishing alcoholic liquor to a minor, and to do so is punishable as a class B person misdemeanor. There are exceptions:

"(d) It shall be a defense to a prosecution under this section if: (1) The defendant is a licensed retailer, club, drinking establishment or caterer or holds a temporary permit, or an employee thereof; (2) the defendant sold the alcoholic liquor to the minor with reasonable cause to believe that the minor was 21 or more years of age; and (3) to purchase the alcoholic liquor, the minor exhibited to the defendant a driver's license, Kansas nondriver's identification card or other official or apparently official document, containing a photograph of the minor and purporting to establish that such minor was 21 or more years of age."

K.S.A. 21-3610a provides:

"(a) Furnishing cereal malt beverage to a minor is buying for or selling, giving or furnishing, whether directly or indirectly, any cereal malt beverage to any person under the legal age for consumption of cereal malt beverage.

"(b) Furnishing cereal malt beverage to a minor is a class B person misdemeanor for which the minimum fine is $200."

This statute basically grants the same defense to a prosecution as does K.S.A. 21-3610(d).

Prime cites K.S.A. 21-3434, which makes it a misdemeanor for a social or fraternal organization to promote or permit hazing. Prime recognizes that the statute does not expressly apply to individuals, but his position, as stated in his brief, is: "This did not provide a defense to the defendants who made the same argument about the Illinois statute in *Haben* [*v. Anderson*, 232 Ill. App. 3d 260, 597 N.E.2d 655 (1992)]." *Haben*, however, and *Quinn v. Sigma Rho Chapter*, 155 Ill. App. 3d 231, 507 N.E.2d 1193 (1987), which Prime also cites, are no longer good law. In *Charles v. Seigfried*, 165 Ill. 2d 482, 491, 651 N.E.2d 154 (1995), the Illinois Supreme Court held that the entire field of alcohol-related liability had been preempted by the Illinois legislature's enactment and periodic amendment of a dramshop act. In *Wakulich v. Mraz*, 322

Ill. App. 3d 768, 751 N.E.2d 1 (2001), the Illinois Court of Appeals recognized that the rulings of *Haben* and *Quinn* had been abrogated by *Charles*.

In addition to the Illinois cases, Prime cites cases from several other states. Prime's argument seems to be that *Ling* and *Mills* are not governing precedent for fraternity liability cases and, in the absence of Kansas fraternity liability cases, the reasoning of fraternity liability cases from other jurisdictions ought to provide guidance to the court. Cases from South Carolina, Arizona, Missouri, and New York are cited by Prime; however, those cases are distinguishable on their facts and applicable law. In addition, Prime does not provide a sufficient reason for concluding that *Ling* and *Mills* are not controlling precedent in the circumstances of this case. We conclude that *Ling* and *Mills* are controlling and thus would preclude any common-law right of action against providers of alcoholic beverages.

Prime's final argument with regard to the individual defendants is that each of them owed him a duty of reasonable care, as applied in *Jones v. Hansen*, 254 Kan. 499, 867 P.2d 303 (1994), and *Bower v. Ottenad*, 240 Kan. 208, 729 P.2d 1103 (1986). *Bower* and *Jones* are premises liability cases. Brian Harper argues that the "reasonable care" argument is raised by Prime for the first time on appeal. Examination of the petition shows that Prime alleged that Pi Kappa Alpha and Mount Oread House Corporation had breached a duty of reasonable care, but that the individual defendants and the local chapter were alleged to have breached duties not to haze Prime or provide beer or liquor to him at all and not in harmful quantities. Nor do Prime's suggestions in opposition to the individual defendants' motions for summary judgment include premises liability arguments. In ruling in favor of all the defendants, the district court clearly stated that the theory of premises liability applied only to "the landlord." The negligence theories pled against the individual defendants were the liability theories rejected by the district court in granting summary judgment for the individual defendants. It is well established that the court will not consider a new legal theory asserted for the first time on appeal. *Wood v. Groh*, 269 Kan. 420, 434, 7 P.3d 1163 (2000).

We next consider whether the district court erroneously entered summary judgment in favor of Pi Kappa Alpha. The district court made the following findings of fact with regard to Pi Kappa Alpha Fraternity, referring to it as "Tennessee":

"3. The Court finds that Tennessee's principal place of business is in Memphis Tennessee and that there were 200 different chapters in the Pi Kappa Alpha Fraternity in February of 1997 which were located in 200 different colleges and universities throughout the United States and Canada. Each chapter is a separate, unincorporated association composed of undergraduate college students. Each chapter exists under the law of a particular state where it is located. Tennessee does not attempt to keep up with the day-to-day activities of any chapters and did not attempt to keep up with the day-to-day activities of the Chapter at the University of Kansas. Tennessee is not informed about a chapter's social functions, and Tennessee does not participate in a chapter's social functions. Tennessee did not possess the right nor the ability to control the day-to-day activities of the Chapter at the University of Kansas and did not exercise any control over such activities. All of the chapters and undergraduate members, together with alumni and other fraternally affiliated entities constitute the entire Pi Kappa Alpha Fraternity. The relationship between Tennessee and the various chapters of the fraternity are governed by the Relationship Statement made an attachment to Defendant Tennessee's Memorandum in Support. It makes clear that Tennessee serves as a resource and support service organization for chapters and members. It serves as a national clearinghouse for the various chapters, members, alumni, and interested groups to share ideas and fellowship, to distribute such information or assistance, to arrange periodic national meetings, to publish fraternal communications, and to collect dues to defray expenses.

"4. The Court further finds that as to the allegations in Plaintiff's Petition regarding the Pledge Dad Night, Tennessee did not plan, participate in, schedule, coordinate, direct or have any involvement with that event, or any similar event in which intoxicating beverages were consumed. Tennessee was never informed as to the method, practice, procedure or custom of the Chapter at the University of Kansas with regard to Pledge Dad Night prior to the incident alleged in Plaintiff's petition. Tennessee was not aware of the event of Pledge Dad Night relative to the local chapter at the University of Kansas before it received the Petition initiating this lawsuit. Further the plaintiff acknowledges that he is unaware of any facts that would suggest that Tennessee knew that Pledge Dad Night was going to occur on the night of this incident. The only contact that plaintiff had with Tennessee was subsequent to the incident when a representative of Tennessee came to the University of Kansas after the incident at the request of the University.

"5. The Court further finds that Tennessee has a standard concerning hazing contained in 'Standards for Retention of Membership, Officer Status, and a Chapter Charter in Good Standing.' The standard defines hazing, in summary, as in-

cluding physical abuse, sleep deprivation, or anything that is contrary to the appropriate laws. The standard also includes the need of chapters to comply with all applicable laws regarding alcohol. The standard states that the Chapter should abide by the standards for retention, and if they do not, they are subject to a charter suspension or termination. The standard further specifically prohibits hazing activities as defined in the standard."

Prime's theories of liability against Pi Kappa Alpha were: (1) The national fraternity owed him a duty to supervise and control the local chapter to protect him from harm; and (2) the national fraternity is liable to Prime for the acts of the local chapter under a theory of apparent agency. The district court rejected both theories.

The district court concluded that the national fraternity had no duty to control, supervise, or protect Prime because "the relationship between Tennessee and the local chapter and Tennessee and the plaintiff are insufficient to create a special relationship which would require Tennessee to protect the plaintiff from harm." On appeal, Prime offers brief suggestions for distinguishing cases that were relied on by Pi Kappa Alpha in its summary judgment motion but were not cited by the district court in its ruling.

A quick look at the cases cited by Prime reveals that some state courts impose liability on national fraternities and others do not. Liability was imposed on the national fraternity organization in *Ballou v. Sigma Nu General Fraternity*, 291 S.C. 140, 352 S.E.2d 488 (1986), and in *Morrison v. Kappa Alpha Psi Fraternity*, 738 So. 2d 1105 (La. App. 1999). National fraternity organizations were not held liable in *Alumni Ass'n. v. Sullivan*, 524 Pa. 356, 572 A.2d 1209 (1990); *Foster v. Purdue University*, 567 N.E.2d 865 (Ind. App. 1991); *Ex parte Barran*, 730 So. 2d 203 (Ala. 1998); and *Walker v. Phi Beta Sigma Fraternity (Rho Chapter)*, 706 So. 2d 525 (La. App. 1997). These cases represent many different factual settings, and, as Prime notes, not all involve injuries due to intoxication or injuries to aspiring fraternity members.

Irrespective of the cases from other states' courts, the issue for this court is whether the national fraternity organization had a duty to protect Prime from harm from excessive consumption of alcoholic beverages. As already discussed, Kansas does not impose li-

ability on the supplier of the alcoholic beverages for harm suffered by a minor due to intoxication. Where there is no legal basis for imposing liability on the fraternity members who provided alcoholic beverages to Prime, for the same reasons, there is no legal basis for imposing liability on the national organization.

Prime also contends that the district court erroneously entered summary judgment in favor of Mount Oread House Corporation. In granting summary judgment in favor of Mount Oread House Corporation (MOHC), the district court made the following findings of fact:

"MOHC is in the business of owning and maintaining the property and house at 2000 Stewart in Lawrence, Kansas, which was leased or rented to the members of the local chapter of the Pi Kappa Alpha Fraternity in February of 1997. There is no written agreement between MOHC and the chapter members; rather, there was an oral agreement pertaining to the payment of rents and upkeep of the house. The members were to maintain the house on a day-to-day basis but were required to pay for any damage to the property or its contents beyond normal wear and tear. MOHC was responsible for capital improvements such as maintaining the driveway, structure, and roof of the house. MOHC officers met monthly or every other month to review the status of the corporation and to address issues regarding maintenance, improvements, and the payment of rents. The meetings of the officers of MOHC typically were conducted at the chapter house so they could review the maintenance and upkeep of the house in person. On occasion, recommendations were made to the chapter members by the officers concerning the necessity for maintenance and upkeep much as a landlord would to a tenant. During these meetings MOHC officers would receive reports from officers of the chapter, typically the president and treasurer, with regard to issues concerning maintenance, upkeep, and finances of the house. During 1997, and other years, there were arrearages on the payment of rents for which MOHC officers sought an explanation and a remedial plan. MOHC does not have a policy concerning the consumption of alcohol in the house; rather, it expects the chapter members to comply with the policies of the universities.

"10. The Court further finds that at no time did the plaintiff receive any written information from MOHC concerning the operation of the house or the local chapter. Plaintiff acknowledges that he is not aware of any facts that would suggest that anyone at MOHC knew that Pledge Dad Night was going to occur on the night the incident happened and, to his knowledge, plaintiff has never had any contact with anyone from MOHC."

Prime alleged in his petition that MOHC owed him a duty "to use reasonable care toward those invited onto its real property"

and breached that duty. In its order granting summary judgment, the district court fleshed out Prime's theories of liability against MOHC:

"11. Plaintiff's counsel acknowledged at the pretrial conference that his theory of liability with regard to MOHC is that of premises liability. He argues that even though MOHC was not a landlord in possession of the leased property, MOHC is liable to the plaintiff under the exception to the general rule of no liability because the premises were leased for admission to the public. Plaintiff argues that such liability is grounded in *Restatement (Second) of Torts § 359* which imposes liability if the lessor knows or should have known by the exercise of reasonable care that an undiscovered condition involves an unreasonable risk of harm to third persons; and has reason to expect that the lessee will admit them before the land is put in safe condition for their reception and fails to exercise reasonable care to discover or remedy the condition or otherwise to protect such persons against it. Defendant MOHC argues that its property is not leased for the admission of the public but rather is a residence much like an apartment or private dwelling. Further, there was no inherently defective condition which posed an unreasonable risk of harm to the plaintiff or others on the property; and that the 'condition' constituting the events of Pledge Dad Night is not the type of condition contemplated which would pose a duty upon the landlord from which to correct or protect the plaintiff.

"12. The Court has previously found that the local chapter is an unincorporated association of individuals. It further finds that *Restatement (Second) of Torts § 359* in inapplicable under the facts of this case insofar as property owned by MOHC was not leased for admission to the public; that there was no inherent condition upon the property which MOHC owed a duty to protect or repair; and that there are insufficient facts in the record to demonstrate that the event of Pledge Dad Night was a 'condition' contemplated by the *Restatement* or that MOHC knew of or should have known of this condition and prevented it. The plaintiff further argues that, as a second basis for liability, MOHC undertook gratuitously to render services to the local chapter beyond that of landlord and, as such, is liable to plaintiff under the *Restatement of Torts § 324A*. The Court finds that MOHC did not undertake, gratuitously or for consideration, to render services to the local chapter members for which it should have recognized the need for protection of the plaintiff."

On appeal, Prime concedes that Kansas courts apply a general rule of no liability for landlords. Citing *Borders v. Roseberry*, 216 Kan. 486, 532 P.2d 1366 (1975), he contends, however, that MOHC should be liable to him under the public admission exception to the general rule, which is stated in § 359 of Restatement (Second) of Torts (1965). As noted by the district court, § 359 states

circumstances in which a lessor may be liable for injuries caused by a condition of the real property. Prime argues that the excessive consumption of alcoholic beverages in the fraternity house should be deemed by the court to be a condition within the meaning of § 359. The reasoning of the court in *Bowers*, however, establishes a category of "active negligence" for injuries due to activities rather than a condition on the premises. 240 Kan. at 222.

Any exception to landlord immunity that has been recognized by this court has been for personal injuries caused by a defective condition on the premises. In addition, liability has been conditioned on the defect existing at the time the tenant took possession and being latent rather than reasonably discernible by the tenant. 216 Kan. at 488-93. In *Roseberry*, the court concluded that the landlord had no liability to a guest who fell on icy front steps because the condition did not exist at the time the tenant moved in and the condition was obvious to the tenant. An activity, such as consumption of alcoholic beverages with the encouragement of the tenants, of course, is discernible to the tenants and would not fall within any exception to the general rule of landlord immunity.

Prime also contends that MOHC is liable because it undertook to render services to the fraternity house tenant, which services MOHC recognized as necessary for the protection of third parties. Prime cites § 324A of the Restatement (Second) of Torts (1965). Apparently, Prime's argument is based on several factors that require an inferential factual link that the district court was unwilling to make and this court declines to make as well. Prime asserts that because the MOHC officers met at the fraternity house where it presumably saw debris from alcoholic consumption and the KU Interfraternity Council placed the fraternity on social probation, MOHC "knew" that the tenants engaged in activities that endangered third persons. Based on its constructive knowledge, Prime would place responsibility for preventing Pledge Dad Night or prohibiting the serving of alcoholic beverages at the event on MOHC. There is no factual basis for this court's finding that MOHC knew of excessive consumption of alcoholic beverages in the fraternity

house, and there is no legal basis for holding the landlord responsible.

Affirmed.