(96 P.3d 674)

No. 91,095

BRENDA L. NOONE, AS HEIR-AT-LAW OF JAMES NOONE, DECEASED, *Appellee*, v. CHALET OF WICHITA, L.L.C. and B.S. INVESTMENTS, INC., *Appellants*, and JAMES D. SEGRAVES, INDIVIDUALLY, *Defendant*.

Opinion filed August 27, 2004.

*John Hicks* and *Michael G. Norris*, of Norris, Keplinger & Hillman, L.L.C., of Overland Park, for appellants Chalet of Wichita, L.L.C., and B.S. Investments, Inc.

*Derek S. Casey*, of Hutton & Hutton Law Firm, L.L.C., of Wichita, for appellee Brenda L. Noone.

Before MALONE, P.J., GREENE and MCANANY, JJ.

*Per Curiam*: This is an interlocutory appeal pursuant to K.S.A. 60-2102(b). The Chalet of Wichita, L.L.C. and B.S. Investments, Inc. (collectively the Chalet) appeal from the district court's order denying the Chalet's motion to dismiss plaintiff Brenda Noone's claims pursuant to K.S.A. 60-212(b)(6). Since we are duty bound to follow Kansas Supreme Court precedent unless there is some indication that the court is departing from its previous position, and since the Supreme Court has declined to depart from its holding in *Ling v. Jan's Liquors*, 237 Kan. 629, 703 P.2d 731 (1985), and the line of cases decided since *Ling*, we reverse; but, in view of the evolution of the common law on this issue, we do so reluctantly.

Noone filed this wrongful death action against the Chalet and James D. Segraves on account of the death of her son, James Noone. In an amended petition, she joined B.S. Investments, Inc. as an owner or operator of the Chalet. She asserted: Segraves consumed four large 32-ounce beers at the Chalet, a restaurant and bar in Wichita. He became obviously intoxicated, and the Chalet furnished him alcohol despite his obviously intoxicated state. Shortly after midnight, Segraves left the Chalet and drove a Corvette automobile owned by Glenda Walden east on highway K-96 at speeds in excess of 90 miles per hour. Meanwhile, James Noone was a passenger in a vehicle driven by Jeremy Pawlak which turned into the eastbound lanes of highway K-96 in front of Segraves' vehicle. Due to Segraves' high rate of speed and his intoxication, Segraves collided with the Pawlak vehicle. Both vehicles burst into flames. Both James Noone and Jeremy Pawlak died as a result of their injuries. Segraves and his passenger, Robert Buckner, were not seriously injured.

In her petition, Noone also cited various statistics about the number of drunk driving deaths and the amount of money that could be saved if the number of drunk driving accidents were reduced. She noted that K.S.A. 41-715(a) prohibits selling intoxicating beverages to an obviously intoxicated individual. More specifically, the statute provides:

"No person shall knowingly sell, give away, dispose of, exchange or deliver, or permit the sale, gift or procuring of any alcoholic liquor to or for any person who is an incapacitated person, or any person who is physically or mentally incapacitated by the consumption of such liquor."

She also acknowledged the prior Kansas Supreme Court decision of *Ling* but asserted that Kansas is in a shrinking minority of states which refuse to hold liquor vendors liable for injuries and damages caused by drunk drivers. Noone asked that the Kansas courts revisit *Ling*.

The Chalet's answer was followed by a motion to dismiss pursuant to K.S.A. 60-212(b)(6). Citing *Ling* and *Prime v. Beta Gamma Chapter of Pi Kappa Alpha*, 273 Kan. 828, 47 P.3d 402 (2002), the Chalet asserted that under Kansas law it could not be

held liable for damages caused by Segraves' actions in driving drunk. In her opposition to the motion, Noone argued that her claims raised an issue of first impression because, unlike *Ling*, this case involved a commercial liquor vendor who provided alcoholic beverages to an obviously intoxicated person on the vendor's premises. Noone also asserted that the reasoning in *Ling* was faulty.

Following a hearing on the motion, the district court found that Noone made a sufficient showing to distinguish her case from *Ling* and denied the motion to dismiss. The court found that the advent of liquor-by-the-drink increased the risk of harm and that the public policy against drunk driving was much stronger now that it was at the time of *Ling*. Finally, the court concluded that a vendor's sale of alcohol to an obviously intoxicated patron increased the foreseeability of harm. This interlocutory appeal followed.

When reviewing the district court's ruling on the Chalet's motion to dismiss for failure to state a claim, we assume the truth of Noone's allegations and the reasonable inferences we can draw from those allegations. We then must decide whether those allegations and inferences state a claim on the theories presented by Noone or on any other possible theory. *McCormick v. Board of Shawnee County Comm'rs*, 272 Kan. 627, 634, 35 P.3d 815 (2001), *cert. denied* 537 U.S. 841 (2002).

*Ling and Its Progeny*

*Ling* was decided in 1985. Ling claimed that Jan's Liquors was negligent in selling alcohol to a minor contrary to state law. She alleged that after the minor became intoxicated, the minor drove a vehicle and struck her, causing injuries which resulted in the amputation of her legs. The trial court granted the defendant's motion to dismiss.

On appeal, the Kansas Supreme Court discussed the history of dram shop liability in Kansas and the various public policy concerns involving drunk drivers. The Supreme Court noted there was no redress allowed under common law against sellers or providers of intoxicating liquors, "either on the theory that the dispensing of the liquor constituted a direct wrong or that it constituted actionable negligence." 237 Kan. at 635. In the Supreme Court's view,

the proximate cause of any injury was the act of the purchaser in drinking the alcohol and not that of the vendor in selling it. 237 Kan. at 635.

The Supreme Court noted that a number of states enacted dram shop statutes which created such a cause of action and that courts in other jurisdictions had judicially abrogated the common-law doctrine of no liability. In Kansas, the territorial legislature enacted a dram shop act in 1859 and a similar statute remained in effect until 1949. See Compiled Laws of Kansas 1862, ch. 35, sec. 10; G.S. 1868, ch. 35, sec. 10; G.S. 1949, 41-1106. At that time, the legislature repealed the dram shop law and enacted the Kansas Liquor Control Act, K.S.A. 41-101 *et seq.*, which contained no dram shop provision. The court noted the legislature had failed to reenact any dram shop provision, the most recent attempt being 1984, the year before *Ling*. See 237 Kan. at 635-38. Finally, the court noted that while both K.S.A. 21-3610(b) and K.S.A. 41-715(b) established criminal penalties for selling alcoholic beverages to minors, violations of these statutes do not constitute negligence per se. 237 Kan. at 639-40. In deference to the legislature, the court stated:

"[T]his court recognizes that declaration of public policy is normally the function of the legislative branch of government. Whether Kansas should abandon the old common-law rule and align itself with the new trend of cases which impose civil liability upon vendors of alcoholic beverages for the torts of their inebriated patrons depends ultimately upon what best serves the societal interest and need. Clearly, this is a matter of public policy which the legislature is best equipped to handle." 237 Kan. at 640.

Noone argues that neither *Ling* nor any other published Kansas case has dealt directly with the liability of a commercial vendor who negligently provides alcoholic beverages to an obviously intoxicated consumer for on-the-premises consumption. *Ling* involved a liquor store which sold liquor to a minor for consumption off the premises rather than a bar which sold liquor for consumption on the premises. Noone also asserts that granting "immunity" to vendors was wrong, that the legislature's failure to enact such legislation was meaningless, and that the enactment of more liberal liquor-by-the-drink laws has undermined *Ling's* reasoning. Finally,

she alleges that the hospitality industry has created a duty upon itself by training its employees in the safe and responsible service of alcoholic beverages.

Though *Ling* was the product of a divided court (four justices joining in concurring or dissenting opinions), in the intervening years the Supreme Court has repeatedly upheld *Ling*'s refusal to impose civil liability upon those whose dispensing of alcoholic beverages has lead to death or personal injuries.

One year after *Ling*, the Supreme Court decided *Fudge v. City of Kansas City*, 239 Kan. 369, 720 P.2d 1093 (1986), in which police officers were sued by third parties for allowing an obviously intoxicated person to get in his car and drive away from a bar. On appeal, the officers argued, in part, that the court should impose civil liability on the bar owners for knowingly providing alcohol to an intoxicated person. Finding *Ling* controlled, the court rejected this claim. 239 Kan. at 375-76.

Two years after *Fudge*, the Supreme Court decided *Meyers v. Grubaugh*, 242 Kan. 716, 718, 750 P.2d 1031 (1988), in which it cited *Ling* favorably and concluded that absent special circumstances, an employer owes no duty to a third party for the tortious acts of an employee who, after consuming alcohol on the employer's premises, leaves and injures a third party. 242 Kan. at 724.

That same year, the Supreme Court answered a certified question from the federal district court in *Thies v. Cooper*, 243 Kan. 149, 150, 753 P.2d 1280 (1988), as to "whether . . . an employer who makes available free cereal malt beverages in uncontrolled amounts to its employees on the employer's premises may be held liable for all foreseeable consequences of its acts and omissions, including torts committed by employees while driving home from the workplace in an intoxicated condition." The Supreme Court rejected cases from other jurisdictions, finding *Ling* and *Meyers* controlling. The court noted that since *Ling*, the Kansas Legislature had failed to enact legislation to modify the common-law rule of no liability. 243 Kan. at 155-56.

Three years after *Thies* and *Meyers*, the Supreme Court decided *McGee v. Chalfant*, 248 Kan. 434, 806 P.2d 980 (1991), an action for personal injuries sustained in an accident with a drunk driver.

The trial court granted summary judgment in favor of two defendants who were alleged to have taken the obviously intoxicated driver to his car. The Supreme Court concluded that imposing liability on these defendants would be "illogical and against public policy" since under *Ling* the provider of alcohol had no liability. Thus, the court concluded, it would make no sense to impose liability on someone "who merely transported an intoxicated person to his automobile." 248 Kan. at 442.

The following year, the Supreme Court decided *Mills v. City of Overland Park*, 251 Kan. 434, 837 P.2d 370 (1992). In *Mills*, decided 5-2, the plaintiffs brought a wrongful death action for the death of their minor son whom they alleged was illegally furnished alcohol by several vendors until he became intoxicated. When Mills became disruptive, he was asked by the management, with the assistance of local police officers, to leave. After leaving the bar, he walked into a nearby field where he was found frozen to death the next day. The parents sued the vendors, the city, and the police officers for negligence. The trial court granted summary judgment to the vendors based on *Ling* and subsequent cases. On appeal, the Supreme Court noted that *Ling* involved a vendor being sued by a third person injured by an intoxicated tortfeasor, while the *Mills* case arose from the death of the alcohol consumer himself. However, citing *Ling*, the court concluded that neither K.S.A. 41-715 nor K.S.A. 21-3610 was intended to create civil liability for violation of their provisions. 251 Kan. at 438-43. While *Mills* recognized the strong public policy to keep intoxicating liquor from minors, the court concluded:

"We conclude that in enacting 21-3610, the legislature did not intend to impose civil liability for violations thereof. If such liability is to be imposed, under some or all circumstances, then we conclude, as we did in *Ling*, that this is a decision to be made by the legislature." 251 Kan. at 443.

Most recently, in 2002, the Supreme Court decided *Prime*, 273 Kan. 828, in which plaintiff, a minor, consumed excessive amounts of alcohol at a fraternity initiation and was hospitalized. The trial court granted summary judgment to the fraternity and its members. On appeal, a unanimous Supreme Court concluded, pursuant

to *Ling*, that there is no cause of action against suppliers of alcohol for persons injured as a result of intoxicated patrons. The court in *Prime* rejected the plaintiff's attempts to distinguish *Ling* as inapplicable to fraternity liability cases and found that *Ling* and *Mills* controlled. 273 Kan. at 834-37.

It is readily apparent that to date the Supreme Court has repeatedly interpreted *Ling* broadly to apply to any effort to hold third persons liable for the torts of an intoxicated person or for violations of the liquor control statutes. We are duty bound to follow Kansas Supreme Court precedent unless there is some indication that the court is departing from its previous position. *State v. Maybin*, 27 Kan. App. 2d 189, 205, 2 P.3d 179, *rev. denied* 269 Kan. 938 (2000). We have no indication that the Supreme Court is departing from its consistently broad application of *Ling*.

*The Legislature's Failure to Act*

Finally, Noone argues that the legislature's failure to enact dram shop legislation is not meaningful. The court in *Thies* thought the contrary. Legislative inaction is not necessarily indicative of legislative intent. See *U.S.D. No. 501 v. Baker*, 269 Kan. 239, 247, 6 P.3d 848 (2000). However, Noone must confront the fact that in the past the legislature enacted and then repealed a dram shop liability statute and has since failed to reenact such a law. Most recently H.B. 2296, initiated in 2003, would have created a cause of action against a liquor licensee for breach of duties created by K.S.A. 21-3610 or K.S.A. 41-715. This bill was carried over to 2004, but no action was taken after hearings before the House committee on February 19, 2004. A nearly identical bill was passed by the Senate in 2004, but it failed in the House.

Given our duty to follow current Supreme Court precedent, we are compelled to reverse the trial court's denial of the motion to dismiss. We do so reluctantly because changes in Kansas liquor laws and the growth and development of the hospitality industry, as noted by the district court, and the evolving trend of the common law on this subject throughout much of the nation directs us down a path away from *Ling*. We note four of the signposts along that path that ultimately may direct Kansas away from *Ling*.

First, an examination of the rationale of *Ling* reveals that its singular legal basis is the common law. The Supreme Court relied upon the common-law rule that suppliers of alcohol are not liable to the victims of an intoxicated tortfeasor. It then announced, in an apparent *non sequitor*, that the legislature is best equipped to handle such matters of public policy. 237 Kan. at 640. Recognition of the evolution of the common law is not achieved solely through legislation. *Ling* itself recognizes this:

"The common law remains in force in this state where the constitution is silent or the legislature has failed to act. K.S.A. 77-109. However, the common law is not static. It is subject to modification *by judicial decision* in light of changing conditions or increased knowledge where this court finds that it is a vestige of the past, no longer suitable to the circumstances of the people of this state. Indeed, we have not hesitated to adopt a new cause of action *by judicial decision* where we have determined that course was compelled by changing circumstances. [Citations omitted.]" (Emphasis added.) 237 Kan. at 640.

Deferring all development of the common law to the legislature makes no sense because common law, by definition, is "the body of law derived from judicial decisions, rather than from statutes or constitutions." Black's Law Dictionary 293 (8th ed. 2004). Common law is "judge-made" rules as opposed to statutory rules. Black's Law Dictionary 294. Even K.S.A. 77-109 recognizes that while statutes may modify our common law, the common law can properly be modified by judicial decisions. When the vast majority of American jurisdictions have repudiated the former common-law rule of no liability under these present circumstances, what is the common law today? The fundamental characteristic of the common law is its continuously developing jurisprudence. For us to honor and apply an antiquated and outdated principle of common law in deference to the legislature is to avoid our clear responsibility as judges. We respectfully suggest that the *Ling* court's observation that "the legislature is best equipped to handle" such matters ignores the co-equal duty of the judiciary to consider, modify, and thereby redirect the course of our evolving common law. It is precisely such inappropriate deference to the legislature that nearly isolates Kansas today on the question before us.

Second, as noted in the dissent in *Ling*, the legislature has already declared public policy in such matters by criminalizing the sale of alcoholic liquor to any person who is physically or mentally incapacitated by the consumption of liquor in K.S.A. 41-715. For the judiciary to await a specific statute declaring civil liability for the same act creates an inexplicable anomaly: your sale of liquor to a drunk can land you in jail, but it will never expose you to civil liability, no matter the consequences. The fundamental logic of the law should compel us to recognize the legislature's clear expression of policy in enacting K.S.A. 41-715 and to act consistent with that policy when considering this "criminality but no civil liability" anomaly.

Third, in its refusal to recognize a cause of action under these circumstances, our Supreme Court has carved out an unauthorized exception to, or an unauthorized immunity from, the clear legislative mandate set forth in K.S.A. 60-1901, which states that "[i]f the death of a person is caused by the wrongful act or omission of another, an action may be maintained for the damages resulting therefrom . . . against the wrongdoer." This statute has been uniformly applied to all persons *except* one who dispenses alcoholic beverages in the context of *Ling* and its progeny. Is this not an odd exception? Is not this exception or immunity *itself* an expression of public policy that those who dispense liquor are a unique, special, and protected group which, by Supreme Court fiat, is entitled to be exempt from a law of universal application? In its deference to the legislature, the court in *Ling* requires a statutory construction and application of K.S.A. 60-1901 *et seq.* that is usually avoided by our courts, if not prohibited by K.S.A. 77-109, which requires statutes in derogation of the common law to be liberally construed to promote their objective. In fact, one may argue that *Ling's* judicially carved-out exception to our wrongful death statute is far more intrusive into the legislative function than the recognition of an evolving common law that imposes civil liability on sellers of liquor under circumstances such as presented here.

Finally, we respectfully suggest that *Ling* is bad public policy. Kansas is now one of only eight states that do not recognize civil

liability under these circumstances. We agree with appellee, who posits:

"It is now time. A recent NHTSA [National Highway Traffic Safety Administration] study lists Kansas as No. 10 among states for drinking-related deaths per mile driven. In 1991, thirty-nine percent of all traffic deaths in Kansas were caused by drunk drivers. Drunk drivers caused two-hundred deaths and more than five-thousand, one-hundred injuries in Kansas during 2001. NHTSA has determined that if Kansas would enforce its laws prohibiting the sale of alcohol to minors or obviously intoxicated persons, there would be an eleven percent decrease in the number of alcohol related fatalities annually. Enforcement of this law, K.S.A. 41-715, could save twenty lives each year. Give these startling statistics and the judiciary's unique vantage point in seeing the civil and criminal prosecutions arising from this carnage, the courts should be sensitive to any remedies that may reduce these tragedies."

Nevertheless, in recognition of our duty to abide by the rule of law announced in *Ling* and its progeny, we reluctantly reverse the ruling of the district court.

Reversed.